# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 22, 2011

No. 09-20825

Lyle W. Cayce
Clerk

SUSAN CARNABY, Individually and as
Representative of the Estate of Roland Carnaby, Deceased,

Plaintiff-Appellant,

versus

CITY OF HOUSTON; CHARLES FOSTER, HPD Officer;
ANDREW J. WASHINGTON, HPD Officer,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Plaintiff Susan Carnaby ("Mrs. Carnaby"), individually and as a representative of the estate of her husband Roland Carnaby ("Carnaby"), appeals a summary judgment for defendant City of Houston and Police Officers Charles Foster and Andrew Washington.  Finding no error, we affirm.

No. 09-20825

I.

In April 2008, Carnaby was pulled over for speeding by a Houston Police Department ("HPD") officer, Charles Starks.[1]  During the traffic stop, Carnaby provided Starks with identification and stated that he was a "CIA Agent." Starks was suspicious of that claim for several reasons and returned to his squad car to confirm Carnaby's credentials.  Starks ran a background check on Carnaby, discovering that he had a concealed handgun license and a 1992 arrest for disorderly conduct, and questioned him to find other ways to check out his story. While Starks was still in his vehicle, Carnaby exited his car, pointed to his cell phone, and got back inside his car.

Starks contacted a sergeant at HPD's Criminal Investigations Command to see whether there was a way to confirm Carnaby's status as a CIA agent.  The sergeant told Starks that he should write Carnaby a ticket and file a report detailing the unique circumstances, but Starks said he could not write a ticket if Carnaby was a federal agent.[2]  The sergeant then asked to speak with Carnaby over the phone.  After doing so, the sergeant told Starks he would call back shortly, and he did so but gave no further instructions.  At the same time, Carnaby again exited his vehicle, pointed to his cell phone, and reentered the car.

---

[1] These facts are from what is seen and heard on several police videos of the incident and from other competent summary judgment evidence where appropriate.

[2] HPD appears to have an internal policy that prohibits its traffic officers from issuing speeding tickets to federal agents.  Although Carnaby has served as an intelligence informant to multiple federal agencies, including the FBI and Secret Service, he has never been directly employed by any of those agencies.  The record is uncertain as to whether he was still actively engaged in any intelligence-related activities, but in the past he appears to have been effective in providing information to federal officials on a number of high-profile incidents, including an assassination plot against President George H.W. Bush in Kuwait; the first World Trade Center bombing; an Iranian counterfeiting scheme; a U.S. Customs agent who sold classified information; the shipping of nuclear materials from Russia to unfriendly nations; and the delivery of nuclear fuel rods to Syria and Iran.  An FBI agent testified that a screenplay was drafted in the 1990's for a film that would chronicle Carnaby's exploits as a spy.  Carnaby was to be played by Chuck Norris.

No. 09-20825

Starks next contacted the police impersonator squad in the Major Offenders Division ("MOD") of HPD, inquiring whether Carnaby could be charged with anything for falsely claiming to be a CIA agent; MOD did not answer Starks's question immediately but said someone would call him back.

Foster arrived to assist Starks; with Foster present, Starks decided to approach Carnaby again. Carnaby told Starks that he had a friend who was a member of HPD, Frank Zavala, on the phone. Zavala told Starks that he believed Carnaby was a CIA agent but had never confirmed that information. Starks questioned Zavala about Carnaby's handgun license, criminal history, and dealings with HPD and told Zavala that Carnaby would eventually be released. Afer the conversation with Zavala, Starks and Foster returned to their vehicles. Zavala called Carnaby back immediately and told him that Starks planned on releasing him.

MOD called Starks back and asked what offense Carnaby had committed. Starks informed MOD of Carnaby's speeding but stated that "I can find another traffic violation somewhere. Let me talk to him a little bit. I'm sure I can find another violation."

While Starks was on the phone with MOD, Carnaby was on the phone with Dennis Franks with the FBI. Franks volunteered to speak with the police officers on the scene, then heard an officer tell Carnaby to step out of the vehicle right before the phone connection was lost.

Starks and Foster had approached Carnaby's vehicle from either side and requested Carnaby to step out; instead, he fled, leading Starks, Foster, and other officers on a car chase that lasted less than fifteen minutes. During the chase, Foster reported over the radio that Carnaby had thrown an object from the car. (That is visible on the video, but the object was never recovered.) Carnaby eventually pulled to the side of the road, ending the pursuit. At the time, the officers did not know why he had stopped, but they would later discover that he

No. 09-20825

had run out of gas.

Because of Carnaby's abrupt stop, a police vehicle driven by Washington was parked in front of Carnaby's car. The vehicles driven by Foster and Starks were parked a few feet behind Carnaby. After the chase ended, Foster and Washington approached the passenger side of the vehicle, while Starks approached the driver's side. Starks unsuccessfully tried to open the door and knocked on the window, receiving no response. He then retreated a few feet and shouted at Foster to "get back, get back."

Carnaby lowered the passenger window about four inches and spoke with Foster and Washington for about thirty seconds. Although the windows were tinted, Foster could see Carnaby talking on his cell phone and switching the phone back-and-forth between his hands. He then rolled his window up.

Foster pulled out his baton and began smashing the passenger-side window while Washington drew his gun and aimed at the window. After a couple hits on the window, Carnaby opened the driver's door. Several officers shouted at him "On the ground!" As the door opened, Washington came around the front of the vehicle toward the driver's side. With the driver's door fully open, Carnaby leaned toward the floor of the car, with his head in the gap between the floor and the open door. The officers could not see Carnaby's hands at that instant.

Washington continued his approach to the driver's door as Carnaby motioned to exit the vehicle. Carnaby, while exiting, began to swing his hands—one of which was grasping an object—around toward Washington. Seeing that, Foster fired his weapon through the car and hit Carnaby in the back. Washington also fired an instant later, but his round struck the driver's door.

Carnaby immediately dropped to the ground and was handcuffed and frisked for weapons. He did not have a weapon on his person, but the officers recovered three guns from his vehicle, one of which was within reach of the driver's seat. The police also recovered a black and grey cell phone on the ground, near

4

No. 09-20825

Carnaby's body.  Carnaby was rushed to the hospital but was declared dead in the emergency room.

## II.

Mrs. Carnaby sued the city, Foster, and Washington under 42 U.S.C. § 1983 for use of excessive force, denial of medical treatment, conspiracy, failure to train, and state tort claims.  On the excessive-force claim, the district court granted the officers' motions for summary judgment, deciding that qualified immunity was appropriate because the use of deadly force was reasonable.  The court also granted the city's motion for summary judgment, concluding that the city cannot be liable if the officers did not violate the Fourth Amendment.  Furthermore, the court found, if it were to reach the merits on the municipal-liability claim, that the city did not fail to train or discipline its officers.  The court also dismissed the remaining state-law claims.  Mrs. Carnaby appeals only the summary judgment on the qualified-immunity and failure-to-train claims.

## III.

We review a summary judgment *de novo*, "using the same standard as that employed by the district court under Rule 56." *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  There is no genuine issue for trial "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party." *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999). We review evidence in the light most favorable to the nonmoving party, but conclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

No. 09-20825

Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. *Scott v. Harris*, 550 U.S. 372 (2007). A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider "the facts in the light depicted by the videotape." *Id.* at 381.

A.

Mrs. Carnaby alleges that the use of deadly force violated her husband's Fourth Amendment right to be free from unreasonable seizure. To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable. *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007). Qualified immunity is appropriate unless the defendant violated a clearly established constitutional right. *Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir. 2009).

Apprehension by the use of deadly force is a seizure, *see Tennessee v. Garner*, 471 U.S. 1, 7 (1985), and Carnaby's death was an injury caused by the deadly force employed, so the only issue is whether the use of that deadly force was unreasonable. To gauge the objective reasonableness of the force, "we must balance the amount of force used against the need for force." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (internal quotation marks and citation omitted). The "[u]se of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003). Our inquiry into reasonableness is fact-specific and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

No. 09-20825

Carnaby was reaching down for approximately 2-3 seconds before moving to exit his vehicle, during which time the officers could not see his hands. He then began to exit the vehicle rapidly while moving his hands around toward an officer. Given those motions, the high-speed chase that immediately proceeded the incident, and the knowledge that Carnaby possessed a handgun license, it was objectively reasonable for the officers to believe that Carnaby was about to bring a firearm to bear on them. The use of deadly force to protect one's own life, as in the case of Washington, or the life of a fellow officer, as in the case of Foster, was objectively reasonable. Though it appears, with benefit of hindsight, that Carnaby was not reaching for a gun when his hands disappeared from the officers' sight, "this court has upheld the use of deadly force where a suspect moved out of the officer's line of sight and could have reasonably been interpreted as reaching for a weapon."[3]

Mrs. Carnaby argues that qualified immunity for the officers is inappropriate, because it was their own negligence in approaching Carnaby's vehicle instead of remaining behind cover that caused them to be placed in a position of vulnerability. That contention, however, has little bearing on our analysis, given the facts. The use of deadly force may be proper regardless of an officer's negligence if, at the moment of the shooting, he was trying to prevent serious injury or death.[4] The officers were trying to prevent serious injury or death, so their

---

[3] *Ontiveros*, 564 F.3d 379, 385 (5th Cir. 2009) (upholding deadly force when the suspect reached into a boot). *See also Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) (upholding deadly force when the suspect repeatedly refused to keep hands raised and appeared to be reaching for an object); *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) (upholding deadly force when suspect refused instructions to exit the vehicle and reached down to the floorboard).

[4] *See, e.g., Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992); *Young*, 775 F.2d at 1353. It is "appropriate in [evaluating reasonableness] to take into account . . . [the] relative culpability [of the respective parties]." *Scott*, 550 U.S. at 384. In *Scott*, the plaintiff, who was the fleeing suspect, contended that the police were culpable by employing a maneuver to stop his speeding automobile, knowing that it would cause serious injury to him. On
(continued...)

No. 09-20825

use of force was reasonable, and we need not proceed further in the qualified-immunity analysis in regard to the officers.

### B.

Mrs. Carnaby maintains that Washington is liable for failure to supervise the other officers on the scene. Under § 1983, however, a government official can be held liable only for his own misconduct. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Beyond his own conduct, the extent of his liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy. There is no evidence that Washington established any sort of policy during this one incident, so summary judgment on this claim was proper.

### C.

Mrs. Carnaby contends that, even if we were to hold that the police officers did not violate her husband's constitutional rights because their use of force was objectively reasonable, the city can be liable for failure to train the officers adequately. Because city policymakers know that their officers will be required to arrest fleeing suspects, the need to train officers on the constitutional limitations

----

[4] (...continued)
the other hand, the suspect was, with his reckless driving, endangering innocent citizens on the highway. That is to say, the culpability to be addressed is that of the party who allegedly used excessive force and the party against whom it was used.

In considering culpability here, we are looking only at the reasonableness of the officer's firing of the gun; that is the only basis for the Fourth Amendment violation of excessive force and the only constitutional injury to which culpability is relevant. As we have said, culpability is a factor in evaluating reasonableness, and reasonableness, not culpability, is the ultimate test. Our primary concern is whether Officer Foster was, "[a]the moment of the shooting," reasonably trying to prevent serious injury or death. *Fraire*, 957 F.2d at 1276. The officers had an objectively reasonable belief that Washington was going to be shot by Carnaby. This was not a belief in possible harm, but a belief in certain harm. The fact that they would later discover this to be a mistaken belief does not alter the fact that it was objectively reasonable for them to believe in the certainty of that risk at that time.

No. 09-20825

of deadly force is "so obvious" that the failure to do so adequately constitutes deliberate indifference and can give rise to § 1983 liability. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Furthermore, if officers regularly exercise their discretion in a manner that often violates constitutional rights, need for further training is also obvious. *See id.*

Mrs. Carnaby alleges that the city failed to train the officers properly in how to approach a high-risk vehicle and that it was the officers' improper approach to Carnaby's car that led to their objectively reasonable belief that deadly force was necessary. In other words, Mrs. Carnaby urges that if the officers had properly approached Carnaby's stopped vehicle, they would not have been in a position in which they would have been at risk from Carnaby's possible firearm, so they would not have shot him.

We have yet to address, directly, whether a municipality can ever be held liable for failure to train its officers adequately where the officers did not commit any constitutional violation; we need not decide that issue here. Even if the answer were in the affirmative, Mrs. Carnaby has not produced sufficient evidence to meet all the requirements for municipal liability. To succeed on her failure-to-train claim, she must show that (1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused Carnaby's injury. *See Conner v. Travis Co.*, 209 F.3d 794, 796 (5th Cir. 2000). Mrs. Carnaby fails on the second requirement.

In support of her claim that the city's policymaker was deliberately indifferent in adopting the high-risk-vehicle-approach ("HRVA") training policy,[5] Mrs. Carnaby points to two pieces of evidence, neither of which is sufficient to defeat

---

[5] In 2004, the officers received mandatory HRVA training, consisting of a slide show presentation and an exercise. During the exercise, four chairs were set up to simulate a vehicle, and the officers practiced how to maintain cover and communicate with suspects.

summary judgment.  First, she points to a high-profile incident that occurred in 1998: the shooting of Derek Kaeseman.[6]  In that case, there was evidence that the HRVA training received by the officers was deficient.  Yet, the mandatory training in 2004 occurred after the Keaseman shooting, and Mrs. Carnaby has produced no evidence that shows that HPD failed to modify its training protocols after the Kaeseman incident.  Even if the Kaeseman shooting put policymakers on notice that their training methods were deficient, the 2004 training could be viewed as a response to those possible deficiencies.  Thus, Mrs. Carnaby must show—but has not shown—that the policymakers were deliberately indifferent to the deficiencies of the 2004 training, not the prior training.

Second, Mrs. Carnaby claims that in HPD there is a pattern of violating the HRVA policy, which would suggest deliberate indifference to the weaknesses of the training given to officers.  In support of that claim, Mrs. Carnaby points to a series of Internal Affairs Divison reports that she claims show possible violations of the HRVA policy that were not adequately investigated.

Many of the incidents Mrs. Carnaby cites to, however, occurred before the mandatory training given in 2004 and are thus irrelevant to the question whether the policymakers were deliberately indifferent to the training given in 2004.  Of the remaining incidents, many are factually distinguishable from the facts of this case.  Reading all the reports in a manner favorable to Mrs. Carnaby, only two reports appear to address incidents that could be construed as a possible violation of the HRVA policy comparable to the violation that occurred here.  Two reports over a period of four years, in a city the size of Houston, do not constitute

---

[6] In the Kaeseman incident, the officers violated the HRVA policy by running up to the car while the suspect was inside and smashing the passenger window.  Kaeseman reached beneath his seat and started to exit the car carrying something shiny, which turned out to be a can opener.  The officers responded by firing more than fifty rounds, hitting Kaeseman fourteen times.

No. 09-20825

a pattern of violating the HRVA policy.[7]

Mrs. Carnaby can point to no concrete evidence that any of the relevant policymakers were deliberately indifferent to any possible weaknesses in the HRVA training. At the most basic level, she has provided no direct evidence that the policymakers should have known that the training provided in 2004 was insufficient to educate officers, such that those policymakers were deliberately indifferent to the training's weaknesses. Thus, even if the city could be liable for failure to train in the absence of a constitutional violation, Mrs. Carnaby has not produced sufficient evidence to defeat summary judgment.

AFFIRMED.

---

[7] *Cf. Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding that eleven incidents of warrantless searches "cannot support a pattern of illegality in one of the Nation's largest cities and police forces").