# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 16, 2014

Lyle W. Cayce
Clerk

No. 13-20022

STEVE HOBART, Individually and as Representative of the Estate of Aaron Hobart; PAM HOBART, Individually and as Representative of the Estate of Aaron Hobart,

Plaintiffs-Appellees

v.

JESUS ESTRADA; BONNY KRAHN,

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-3332

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

JAMES E. GRAVES, Jr., Circuit Judge:*

This is an appeal of the district court's denial of a motion for summary judgment on the basis of qualified immunity in an excessive force case arising from the shooting death of a mentally ill teenager after the parents sought the assistance of a Crisis Intervention Team officer in transporting the teenager to the hospital. Because the district court did not err and we lack jurisdiction

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-20022

over this appeal with regard to Officer Jesus Estrada, we DISMISS as to the first issue. A separate majority REVERSES the denial of summary judgment as to Chief Bonny Krahn, granting him qualified immunity on the claim he failed to train on the appropriate use of force.

## FACTS AND PROCEDURAL HISTORY

Aaron Hobart was a nineteen-year-old who suffered from a schizoaffective disorder, which caused delusions. Aaron had been under the treatment of various physicians and was taking medication, but stopped taking the medication in November 2008. Aaron's mental health was deteriorating and on February 16, 2009, his mother, Pam Hobart (Mrs. Hobart), called the office of his psychiatrist, Dr. C. Scott Moreland, to request an appointment. An appointment was scheduled for February 18. Dr. Moreland's office instructed Mrs. Hobart to notify them if Aaron's mental status changed and she was instructed to take Aaron to the emergency room or call 911 if he became a danger to himself or others.

On February 18, 2009, Aaron refused to leave his room to visit the doctor. Aaron's father, Steve Hobart (Mr. Hobart) returned from work to find Aaron in his room and speaking "belligerently and abusively" in a raspy alternate voice. Dr. Moreland instructed Mrs. Hobart not to force Aaron to attend the appointment that day and emailed instructions regarding the administration of Aaron's medication, for which Dr. Moreland called in a prescription to the local pharmacy. He also provided information on the Houston Crisis Intervention Team (CIT). The CIT program educates police officers on mental illness and tactics to verbally de-escalate situations involving individuals in serious mental health crises. The information provided by Dr. Moreland indicated that the proper course of action in an emergency situation would be to call 911 and request a CIT officer, who would have the appropriate training

2

and could take the patient to a facility for an emergency mental health evaluation.

Mr. Hobart tried unsuccessfully to get Aaron to take the medication, despite informing Aaron that if he failed to take it he would be transported to the hospital so it could be administered and he would not have access to his laptop computer or his cellular telephone. As a result of Aaron's deteriorating mental health crisis, Mrs. Hobart called 911 and requested a CIT officer. Mrs. Hobart advised the Stafford Police Department (SPD) that Aaron was becoming very violent and delusional, that he needed medication and needed to be in the hospital, but that he was not hurting anyone, did not have any weapons, and was not under the influence of any substance. The operator indicated that an officer would be dispatched to the home. SPD officers Garcia and Claunch were the primary officers dispatched to the house, but Officer Jesus Estrada was the first to arrive on the scene. Estrada, who was then 23 years old, admitted that he had been advised that Aaron was not armed and that he was delusional.

It is undisputed and evidenced by the patrol car dash cam video, that Estrada, who did not wait for the primary responding officers to arrive, entered the home by himself at approximately 15:07:59 and began conversing with Mrs. Hobart. At approximately 15:08:15, Estrada shouted "Stop!" three times and "Get back!" twice, while Mrs. Hobart screamed "Stop!" multiple times. At approximately 15:08:20, twenty-one seconds after Estrada entered the home, gunshots are heard. Estrada then began shouting, "Goddamnit!" "Shots fired!" and "Oh my god!" and Mrs. Hobart was screaming.[1] Estrada fired six or seven shots, four of which struck Aaron: one in the back of the right upper neck,

---

[1] There are differing versions of the events, which will be discussed more fully herein, that transpired during Estrada's fifty-four seconds in the house, specifically during the first twenty-one seconds when Aaron was killed.

which severed his spinal cord; one in the right lower back; one in the back of the right hip; and one in the right middle back.  At approximately 15:08:43 the other officers arrived at the house and accompanied Estrada outside onto the lawn, where he knelt down with his head on the ground and sobbed, repeatedly saying, "Oh, my god" and later asking "what is wrong with me?"  Dispatch transcripts following the shooting repeatedly indicate that no officers were injured during the incident.

As a result of Aaron's death, his parents filed an action against the City of Stafford, Estrada, and Chief of Police Bonny Krahn for the unconstitutional use of excessive and deadly force, assault and battery, bystander injury, violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and various claims regarding department policy, failure to supervise and failure to train.  The district court partially granted the defendants' motion for summary judgment on various claims.  Of relevance to this appeal, by orders dated April 29, 2011, April 17, 2012, and January 9, 2013, the district court denied the defendants/appellants' motion for summary judgment on the basis of qualified immunity, with regard to Estrada's use of excessive and deadly force and Krahn's failure to train.  Subsequently, Estrada and Krahn filed this appeal.

**STANDARD OF REVIEW**

This court reviews de novo a district court's denial of a motion for summary judgment on the basis of qualified immunity. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable, to the extent that it turns on an issue of law. *Kovacic*, 628 F.3d at 211.  The limitation of the interlocutory appellate

jurisdiction to questions of law prohibits this court's consideration of the correctness of plaintiff's version of the facts. *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

> This means that the district court's finding that a genuine factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal. But the district court's determination that a particular dispute is material is a reviewable legal determination. Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.

Id. at 397-98. (Internal marks, citations and emphasis omitted). *See also Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) ("If a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material and we lack jurisdiction over the appeal.").

This court has further said that it assigns greater weight, even at the summary judgment stage, to facts evident from video recordings taken at the scene. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir.2011). "A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.' " Id. (quoting Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). *See also Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

## DISCUSSION

### I. Whether the district court erred by failing to enter summary judgment in favor of Police Officer Jesus Estrada on the basis of qualified immunity.

Excessive force claims are necessarily fact-intensive. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). To establish a Fourth

Amendment violation, the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). To overcome an officer's claim of qualified immunity, the Hobarts must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

Aaron's death was caused by an injury which resulted from the deadly force employed by Estrada, so the issue is whether the use of that deadly force was unreasonable. This court gauges the objective reasonableness of the force by balancing the amount of the force used against the need for force. *Carnaby*, 636 F.3d at 187-188. The factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167.

Estrada testified in his deposition that when he entered the house at the invitation of Mrs. Hobart, he thought the disturbance was over because everything was quiet and normal. After speaking with Mrs. Hobart, the two walked down the hall approximately five feet from the front door and he saw Aaron approximately thirty to forty feet away standing in his bedroom facing away from Estrada. Estrada said that Aaron turned, saw him, loudly "roared," raised his arms to waist level and began to charge. Estrada testified that he was unable to get out of Aaron's way or out of the house, and that Aaron began "attacking" him. In his statement to police, Estrada characterized this as, "he fucking nailed me, dude." Estrada testified that he was thinking "oh, shit. Oh, shit" because he was "fixing to either get hit or we're fixing to have a fight." Estrada testified that he attempted to remove his ASP baton, but was unable to because he was hit in the face. However, when confronted with his prior

statement, Estrada said that the baton was actually stuck in his holster, which he later discarded and replaced. Estrada also testified that he was unable to use his OC (pepper) spray, although he did not know how long it would have taken to get his OC spray out of his holster.

Of particular significance, Estrada testified that he was "punched in the face" to the point that he was "disoriented for a second or two" and then unable to make a calm, rational decision. Estrada was unable to remember when he came back to his senses, although he did have the wherewithal to shout "Stop!" and "Get back!" and pull his duty weapon during this time. With regard to the "attack," Estrada testified that he never actually saw Aaron hit him, but rather he remembered "hearing – or hearing and feeling the thumps on my head" which he attributed to being punched in the left side of the head. Estrada admitted that he did not know how he got hit and that he informed the staff at the hospital that he did not know how he got hit. Significantly, regarding when he decided that Aaron had hit him in the head, Estrada testified that he decided, "Once I learned from my attorney" that Aaron had hit him because "there was no weapons involved."

While Estrada remembered pulling his duty weapon and seeing a "fist," he remembered only "what I knew in my ears was the concussions (sic) of bullets" and did not realize he was shooting or at whom he was shooting. Estrada said he believed his life was in danger because "I remember seeing stars, sir, and dark – darkness coming into what I knew was my vision" which meant he was about to be "knocked out." However, Estrada was unable to remember his location at the time of the shooting, where Aaron or the Hobarts were positioned in the home, how many times he shot Aaron or the location of the entry wounds on Aaron's body, or how many other shots were fired or where they landed, including one that went through the front door seconds before the primary officers arrived. Estrada was also unable to explain the location of

blood indicating that Aaron was shot farther up the hallway than where he was found.

After shooting Aaron, who was collapsed in a pool of blood with a severed spinal cord, Estrada also remembered "feeling the thump whenever I – I fell on my back," yelling, and attempting to close his hand around his gun to shoot Aaron some more because "I thought he was – he was coming – coming for me again." Estrada's reaction was actually to the arrival through the front door seconds later of the other officers who were then grabbing Estrada by his vest to take him outside.

In his statement to police, Estrada also said that he remembered Aaron being bigger than him. In fact, Aaron was about four inches shorter and some thirty pounds lighter than Estrada.

During his deposition, Mr. Hobart testified that he was sitting on the floor in Aaron's room while Aaron paced back and forth. Aaron was speaking belligerently and in a hoarse, alternate, whispered voice. Mr. Hobart attempted to get Aaron to take the medication prescribed by his doctor, and when Aaron refused, Mr. Hobart explained to Aaron that he would have to be taken to the hospital where the medication would be administered. Mr. Hobart said he also told Aaron that he would lose the ability to access his cellular telephone or his laptop while in the hospital. Mr. Hobart said that, after hearing Estrada's voice, "I remember thinking to myself that the Crisis Intervention Team had likely arrived and that they were going to be burly men with a straightjacket ready to take Aaron to the hospital." Shortly after hearing Estrada's voice, Aaron moved toward the doorway of his bedroom and Mr. Hobart testified that, "I reached the conclusion that he was trying to exit and that the guys ready to receive him would probably need some notice, so I called out, 'Here he comes.'" Mr. Hobart was still seated in Aaron's room when Aaron exited and by the time Mr. Hobart went into the hallway, Aaron had

already been shot. Mr. Hobart observed Estrada in a sitting or near sitting position, speaking forcefully and cursing.

> I turned my gaze towards Aaron and I saw that his body was prone, facedown. His head was turned towards the front of the house. The most striking thing in my field of vision was a big hole in the back of his head – in the back of his head. I was almost transfixed by that.
>
> I thought, how does he get shot in the back of the head? And being that he's shot in the back of the head is where all this blood on the floor is coming from probably, because I know the head takes a lot of our blood supply, and I had to get over there and plug that hole, put some pressure on it.
>
> But I was also thinking, a bullet to the brain, either he's going to die or he's going to be in a coma. If he's in a coma in that deteriorating mental state that he's in, it's going to be a long hell for him. And I just knew that I had to go plug the hole.
>
> . . .
>
> I was next to him kneeling towards the interior of the foyer with my hand, my right hand over the hole in the back of his head.

Mr. Hobart also testified that Estrada did not render any first aid to Aaron, and that shortly thereafter two additional officers entered the home.

Mrs. Hobart testified during her deposition that when Estrada arrived she was under the belief that she was "getting a CIT person" who was going to explain things and go "through a certain procedure, so I was trusting that they knew what was going to happen next." She further testified that Aaron was flailing his arms as he went toward the front door and that his arms hit Estrada's arms, but she never saw Aaron hit Estrada in the head. She testified that Aaron flailed his arms for four or five seconds, then stopped, and that it was approximately two or three seconds after he stopped that Estrada began firing.

> After they had pivoted around and the officer now was pretty much where Aaron was and now Aaron was closer to the door and there was a separation of two or three feet. And that's when the

officer pulled his gun, and that is when I had shifted my weight to go in-between them, and that's when he pulled his gun. And that's when I backed up behind him, right at the point of where the hallway was. . . .

The district court found that there is conflicting evidence on whether Estrada had probable cause to believe that Aaron posed a significant threat of death or serious physical injury to Estrada or to others and that a reasonable jury could find that Estrada lacked such probable cause. As the district court found, the video recorded only audio from within the house and does not show what actually occurred inside the home. Mrs. Hobart was an eyewitness to the events that led up to the shooting. Moreover, Estrada admitted that he did not see Aaron hit him.

The record contains photographs, purportedly taken the night of the shooting despite sunlight being visible through the window in some of the photographs, which establish that Estrada suffered no bruising or apparent injury. The photographs do show some minor redness underneath Estrada's left sideburn, which the Hobarts' attorney aptly described as similar to razor burn, and some acne-like bumps on Estrada's back, although Estrada does not claim that Aaron hit him in the back or the lower face. Further, in one of the photographs, Estrada is using the business card of his criminal defense lawyer, who was hired and waiting for him at the hospital within about twenty minutes of the shooting, to measure the size of the very small area under his sideburn. Estrada argues in his brief that the injuries to his head required hospital treatment and that the district court ignored material evidence that "establishes Officer Estrada had bruising, substantial swelling and symptoms of traumatic brain injury as a result of Hobart's attack." Notably, Estrada fails to provide any citation to the record in support of this claim. Further, the record does not support any such claim. While Estrada was taken to the

hospital, where he was treated and released, Estrada testified that he did not know what prescription he received, for what amount or for how long he took it. Also, the photographs do not show an "egg sized contusion" that Estrada asserts was seen by another detective. Also, again, dispatch transcripts following the shooting repeatedly indicate that no officers were injured during the incident.

Mrs. Hobart specifically requested that a CIT officer be dispatched when she called 911. She clearly told the dispatcher that Aaron was becoming delusional and violent, but that he was not hurting anyone, needed medication and needed to be hospitalized. The district court thus found that, "based on the 911 call, there was reason for Officer Estrada or other police officials to believe that Hobart could potentially be violent, but not that he had committed any crime or hurt anyone." The district court also found that the video does not support Estrada's claim that Aaron made any noise such as a "roar" or that Estrada's life was in jeopardy. Specifically, the court said:

> Accordingly, if a jury were to credit Mrs. Hobart's testimony, it could reasonably conclude that Officer Estrada faced only minor physical contact from Aaron, and that such contact ended and the two men were separated for multiple seconds prior to Officer Estrada pulling out his gun and shooting Aaron approximately six times. Under that factual scenario, Officer Estrada would lack probable cause to believe that Aaron posed a significant threat of death or serious physical injury to Officer Estrada or to others, and shooting Aaron in the manner that he did would be clearly excessive and unreasonable.

The district court thus found summary judgment inappropriate based on the genuine issues of material fact. The district court further found that Estrada was not entitled to qualified immunity because the plaintiffs had provided evidence of a factual scenario under which Estrada's use of force

would constitute a constitutional violation of clearly established law and was objectively unreasonable.

The district court's thorough and well-reasoned orders are entirely supported by the record. As the district court noted, regardless of whether an officer's mental state caused him to panic such that he unreasonably determined that a threat was present, that would not render his determination reasonable. As stated previously herein, *Ontiveros* provides the standard that must be met in an excessive force case such as this. *Ontiveros,* 564 F.3d 382. Again, Aaron's death was caused by an injury which resulted from the deadly force employed by Estrada, so the issue is whether the use of that deadly force was unreasonable. Again, this court gauges the objective reasonableness of the force by balancing the amount of the force used against the need for the force. *Carnaby*, 636 F.3d at 187. Based on the analysis above, the applicable law and the record in its entirety, Estrada has failed to establish that his use of deadly force was reasonable. *See Deville*, 567 F.3d at 167-169; *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004); and *Bazar v. Hidalgo County*, 246 F.3d 481 (5th Cir. 2001). Therefore, he is not entitled to summary judgment on the basis of qualified immunity. Further, this appeal is based on a factual dispute. As stated previously, "if a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material and we lack jurisdiction over the appeal." *Manis*, 585 F.3d at 843. Neither the record nor the video discredits the plaintiffs' version of the facts, therefore, this court does not have jurisdiction over the appeal. Accordingly, we dismiss as to Estrada.

**II. Whether the district court erred by failing to enter summary judgment in favor of Chief of Police Bonny Krahn on the basis of qualified immunity.**

LESLIE H. SOUTHWICK, Circuit Judge:

The Hobarts stated claims against the City of Stafford and Chief Krahn, contending the City had a policy of inadequately training its police officers and that Chief Krahn was liable for his role in implementing the City's allegedly deficient policies. They point to three distinct subjects on which the Stafford Police Department's training was deficient: (1) training on the appropriate use of force, (2) Officer Estrada's CIT training, and (3) training on the proper method of dispatching mental health calls. The district court granted qualified immunity to Chief Krahn on the second and third claims. The Hobarts have not cross-appealed, and thus the court's grant of qualified immunity for Chief Krahn on those theories of liability is undisturbed.

The court denied Chief Krahn qualified immunity on the claim that he had failed to train officers on the appropriate use of force. Thus, the single basis remaining for Chief Krahn's liability, and the subject of our review, is whether the district court erred in denying Chief Krahn qualified immunity on the claim he failed to train SPD officers on the appropriate use of force.

"Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (citation omitted). To establish Section 1983 supervisory liability against Chief Krahn, the Hobarts must show that "(1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights." *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).

13

It is not disputed that the City delegated policymaking authority for the police department to Chief Krahn.  The policies are contained in the "General Orders," which are the written guidelines of the department which contain all SPD policies with respect to the conduct of police officers – including the use of force.  Regarding the department's policy on use of force, Sergeant Claborn testified that Estrada's actions complied with department policy and that officers were trained to fire until a threat is over if they are losing consciousness.  Claborn did not suggest that officers were trained to adjust their use of force based on the severity of the situation, or to use the least amount of force necessary.  Chief Krahn also testified that Estrada complied with department policy on the night of Aaron's death.  The record indicates an internal investigation found Estrada's conduct was within the guidelines of the SPD.  During his deposition, Officer Estrada was repeatedly unable to provide the appropriate policy or procedure with regard to the use of force.  He testified that it was appropriate to use deadly force wherever he deemed necessary.

As we conclude in Part I of this opinion, Officer Estrada has failed to establish that his use of deadly force was reasonable.  The evidence indicates, nevertheless, that Estrada's use of force was in compliance with department policy.  We agree with the district court that a factual question exists regarding the sufficiency of the training SPD officers received with respect to the appropriate use of force.  The denial of qualified immunity for Chief Krahn, however, also requires proof that the failure to train on the appropriate use of force amounted to deliberate indifference.

"Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) (citation omitted). Deliberate indifference may be found in two types of situations: (1) a general failure to provide adequate training in light of the foreseeable serious

consequences that could result, and (2) a municipality fails to act in response to the specific need to train a particular officer. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000). We deal with the first — that Aaron's death was a foreseeable consequence of the lack of training of all officers on appropriate force. To establish deliberate indifference, a plaintiff must usually show a pattern of similar violations. *See Valle*, 613 F.3d at 547. Even without evidence of a pattern of similar incidents resulting from a deficient training policy, a plaintiff can still establish deliberate indifference under the single incident exception. *Id.* at 549. This exception is narrow and requires proof "that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (citation omitted).

The Hobarts argued to the district court — in their response to Chief Krahn's motion for summary judgment on the basis of qualified immunity — that their evidence established a pattern of similar violations "in that the person in charge of training with respect to the use of force testified that the city had trained for years to use subjective evaluation for use of force and that it is not required to use the least amount of force necessary." Although they cite to evidence that there was a pattern of failing to train, they did not cite to evidence of a pattern of similar incidents concerning the use of excessive force. They also mention the single incident exception, but only in the context of their claim for failure to train on CIT procedures. No evidence is put on by the Hobarts explaining application of the single incident exception to their claim for failure to train on the use of force.

The district court correctly identified that, because the Hobarts had not introduced evidence of similar incidents, they must establish deliberate indifference under the single incident exception. The court then explained that

the single incident exception required evidence that Chief Krahn "had sufficient notice . . . that the failure to train [officers on the appropriate use of force] was likely to lead to a violation of the Fourth Amendment rights of those [they] would encounter." *Brown*, 219 F.3d at 460. The court acknowledged that the present case was distinguishable from *Brown* — which concerned the training of a single deputy — because the allegation here is that the use of force training provided to all officers was constitutionally deficient. Nevertheless, the court relied on *Brown* and the Supreme Court's decision in *City of Canton* to conclude that a jury could find that the need to train officers on the constitutional limitations on the use of force was "so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *City of Canton*, 489 U.S. at 390 n.10 (quotation marks omitted). This conclusion was based solely on evidence that the City knew its officers would find themselves in situations where they were required to determine the appropriate level of force to use and equipped its officers with firearms, allowing them to use deadly force. *Id.* On appeal, the Hobarts repeat this analysis, citing the evidence that the Chief knew his officers were armed and would find themselves in situations requiring a determination on the appropriate use of force as evidence of the obviousness of the need to train on the use of force and demonstrating Chief Krahn's deliberate indifference. They cite no additional evidence supporting application of the exception.

In *Valle v. City of Houston*, we indicated that, typically, application of the single incident exception requires evidence of the proclivities of the particular officer involved in the excessive use of force. 613 F.3d at 549 (collecting cases applying or denying application of the exception). While our case law does not absolutely require evidence of character traits or proclivities of the officer responsible for the single constitutional violation, "such evidence certainly is probative in determining that a 'highly predictable' consequence of

sending the particular officer[] into a particular situation would be a constitutional violation." *Id*. Notably, the district court here conducted the *Valle* analysis of Officer Estrada's proclivities in assessing whether the failure to train on CIT procedures was undertaken with deliberate indifference under the single incident exception. The court did not conduct a similar inquiry discussing *Valle* and evidence of Officer Estrada's history or proclivities for using excessive force in the context of the claim for failure to train on the use of force.

"This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability." *Id*. In fact, we are aware of only one instance in which we found a single incident sufficient to support municipal liability; that case included "an abundance of evidence about the proclivities of the particular officer involved in the excessive use of force." *Id*. Here, the district court applied the exception based solely on evidence that the training was deficient, and that officers will naturally find themselves in situations requiring an assessment on the appropriate use of deadly force. Thus, the court in effect concluded, because Chief Krahn must know the risks of not training properly on the use of deadly force, he could be found deliberately indifferent for not providing better training. We conclude that is far too expansive an application of what is supposed to be an extremely narrow rule. It converts general knowledge of the dangers inherent if poor training is given on the use of force to specific deliberate indifference on the part of this police chief to the risks his office's training created.

Deliberate indifference flows from knowledge of the effects of decisions or conditions and taking no steps to correct the shortcomings, which is why the single-incident exception rarely can succeed. Instead of showing a prior incident that would have created the knowledge, the Hobarts have done

nothing more than show deficient training on the use of force.  In the absence of a prior incident, the training deficiencies must have been so obvious that the shooting here would have appeared to Chief Krahn as a "highly predictable consequence."  *Valle*, 613 F.3d at 549.  The Hobarts have not brought to our attention any case, and we are aware of none, supporting a finding of deliberate indifference based on no more than this. *See id.* (requiring more proof of the possibility of recurring situations than that sending in a non-CIT trained officer to a situation involving mental health individuals would likely constitute the use of excessive force).

We find no evidence to support that Chief Krahn was aware that a shooting such as this was a highly predictable result of the training being provided.  It was incumbent on the Hobarts to present such evidence.  They did not do so in the form of a pattern of violations or the proclivities of Officer Estrada.  The Hobarts also did not offer any other evidence to support that deficiencies in the training made Chief Krahn deliberately indifferent when he did not provide better training.

Accordingly, the district court erred in concluding the failure to train on the appropriate use of force was undertaken by Chief Krahn with deliberate indifference.  Chief Krahn is entitled to qualified immunity on the claim he failed to train on the appropriate use of force.

We DISMISS the appeal of the district court's denial of summary judgment for Officer Estrada on the basis of qualified immunity.   We REVERSE the district court's denial of summary judgment for Chief Krahn on the claim for failure to train on the appropriate use of force and GRANT Chief Krahn qualified immunity.

No. 13-20022

GRAVES, Circuit Judge, dissenting, in part, as to Issue II:

The separate majority essentially eliminates the applicability of the single incident exception to claims for failure to train on the use of deadly force and reverses the denial of summary judgment to Chief Krahn.  I disagree. Because I would affirm the district court's denial of summary judgment and dismiss Krahn's appeal, I respectfully dissent only as to Issue II.

This court has said that "[s]upervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Mouille v. City of Live Oak, Texas*, 977 F.2d 924, 929 (5th Cir. 1992).

Krahn asserts that the City's police officer training program exceeds constitutional standards, that he was not deliberately indifferent, and that he was not objectively unreasonable.[1]   The Hobarts assert that they have presented evidence that Estrada's excessive force actions were entirely consistent with SPD policy and that Krahn was deliberately indifferent in failing to train Estrada on the use of deadly force.

In a failure to train case, the Hobarts can prove deliberate indifference either by showing a pattern of tortious conduct providing notice of inadequate training or by using, as is applicable here, the single incident exception.  *See Board of County Comm'rs of Bryan Cnty v. Brown,* 520 U.S. 397, 405-408, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Under the single incident exception, a single violation of rights may be sufficient to prove deliberate indifference. *Id*. at 408-409.

---

[1] The majority concedes that the only issue remaining is whether Krahn was deliberately indifferent.

19

No. 13-20022

The majority misapprehends the holding in *Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010), as indicating that "typically, application of the single incidence exception requires evidence of the proclivities of the particular officer involved in the excessive use of force." Not only is there no such requirement under *Valle*, but such a requirement would defeat the very notion of a *single* violation.[2] Contrary to the majority's holding here, *Valle* actually says that, although such evidence may be probative in determining a highly predictable consequence for municipal liability in a situation involving sending a particular officer into a particular situation, there is no requirement of any such evidence. *Id.* at 549. *See also Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 459 (5th Cir. 2000) ("[L]iability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations."). Moreover, the United States Supreme Court has made it clear that, "once a municipal policy is established, 'it requires only one application ... to satisfy fully *Monell's*[3] requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n.6, 106 S.Ct. 1292 (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 822, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Thus, any requirement of evidence showing a history of violations pursuant to the policy contradicts controlling precedent.

More importantly, while the majority is correct that the single incident exception is narrow, *Valle* does not in any way suggest that *death* is not a highly predictable consequence of failure to train on the use of *deadly* force.

---

[2] Likewise, there is no requirement that the district court engage in any analysis of such evidence in assessing a claim for failure to train on the use of deadly force. I also note that the use of force is a recurring police function with highly predictable consequences.

[3] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),

Further, in this case, the failure to train on the use of deadly force would clearly represent the moving force behind the constitutional violation stemming from unreasonable use of deadly force.  Moreover, this is consistent with Supreme Court precedent, which clearly supports the conclusion that Krahn was deliberately indifferent.  *See City of Canton v. Harris*, 489 U.S. 378,109 S.Ct. 1197, 103 L.Ed.2d 412 (1989):

> [Krahn] has armed [his] officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.

*Id.* at 390 n.10 (internal marks and citation omitted).  *See also Brown*, 219 F.3d at 459 ("Thus, when the city arms its officers to carry out this task, there is thus the obvious need to train officers in the constitutional limitations on the use of deadly force.  This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights.").

The majority's use of language indicating that the only instance in which we have found a single incident sufficient included "an abundance of evidence about the proclivities of the particular officer involved in the excessive use of force" is of no import.  While this court did include such an observation in *Valle*, 613 F.3d at 549, the majority's use of it here is a misapprehension of what occurred in *Brown*.  In *Brown*, although this court did discuss the officer's "personal record of recklessness and questionable judgment," we clearly concluded, as set out above, that liability can attach for a single incident even when there is no such pattern.  *Brown*, 219 F.3d at 463.  Furthermore, even if

evidence about the proclivities of the officer was required, evidence of such exists here.[4]

During his deposition, Estrada was repeatedly unable to provide the appropriate policy or procedure, specifically with regard to the Use of Force Continuum and/or dealing with mentally ill persons. Estrada also did not know whether he had ever had any field training dealing with mentally ill persons. Estrada testified that it was appropriate to use deadly force wherever he deemed it necessary. Further, Estrada testified that none of his supervisors had ever indicated that he used excessive force in the shooting of Aaron Hobart, he was never reprimanded, and nobody ever discussed the incident with him – other than to have him see a doctor – or reviewed the levels of force and the applicability for the use of each one. However, Estrada did receive CIT training after the shooting.[5] Estrada was also unable to explain the meaning of things like "high-risk affair" and "exigent circumstances." Estrada testified that it was the policy and practice of the City of Stafford for him to enter the scene by himself. He also testified that mentally ill people or drug addicts who

---

[4] Estrada's training record indicates that, during field training in October, November and December of 2007, he was repeatedly rated below the minimum acceptable rating in common sense and judgment, officer safety, department policies and procedures, and communications. He was also rated below the minimum acceptable rating for control of conflict at least once. There was no evidence presented of any subsequent evaluations or training.

[5] The Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) mandates that officers complete CIT training. The parties dispute whether Estrada completed CIT training prior to the shooting of Aaron Hobart. Krahn testified that TCLEOSE began mandating CIT training in 2005 or 2006 and that all officers were required to have completed mandated training by August 2008. Krahn was responsible for the CIT training. Any officer who did not receive CIT training in their original program was required to take a special training program. Estrada did not take the special training, but testified that he received CIT training through the basic police academy. However, Estrada's training record clearly states that he completed zero hours of CIT training. Thus, there is a question of whether Estrada received any CIT training prior to Aaron's shooting. There is also a question as to the actual order in place at the time regarding dealing with mentally ill persons.

are hallucinating are not treated any differently than regular people who are being arrested.

In his deposition, Krahn testified that he has had the authority to adopt departmental policies and procedures for more than ten years. These policies are contained in the "General Orders" or written guidelines of the department. The SPD has a General Order regarding the handling of mentally ill persons, but, as the district court found, it is not clear whether this is a final version of that order because it is not the same version as found in the then-applicable General Orders.

Krahn was responsible for ensuring his officers received proper training. Krahn was also the policymaker responsible for promulgating the General Orders of the SPD. The record indicates that an internal investigation found that Estrada's conduct in using deadly force was within the guidelines of the SPD. Estrada said that he was trained to shoot his gun if he began seeing "stars" or "black." Sergeant Dustin Claborn testified that officers, if going unconscious, are indeed trained to fire until the threat is over, regardless of their surroundings and regardless of whether the officer reasonably believes his life is in danger. Claborn also testified that Estrada's actions complied with department policy. Krahn likewise testified that Estrada complied with department policy, which was promulgated by Krahn. Estrada was repeatedly unable to provide the appropriate policy or procedure with regard to the use of force. As discussed in Part I, Estrada has failed to establish that his use of deadly force was reasonable.

With regard to Krahn, the district court found summary judgment inappropriate based on genuine issues of material fact. The district court further found that Krahn was not entitled to qualified immunity because the plaintiffs had provided evidence of a factual scenario under which no reasonable officer in "Krahn's circumstances would have believed it to be

lawful to fail to train police officers on the appropriate use of force." Further, "[i]t would be illogical to suggest that the deliberately indifferent failure to train police officers about appropriate levels of force was not clearly established at the same time, and the Court concludes that it was." The district court also found that a question of fact remained as to whether officers were properly trained on the use of force. In light of these facts, the court opined that "a jury could find that the need to train SPD officers in the constitutional limitations on the use of force, and the use of deadly force in particular, was 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." The district court's thorough and well-reasoned orders are entirely supported by the record. The separate majority acknowledges that a factual question exists regarding the sufficiency of the training of SPD officers with regard to the appropriate use of force, but then finds the failure to train does not amount to deliberate indifference. I disagree.

The majority concedes that the Hobarts have cited evidence of a "pattern of failing to train." The majority then concludes that the Hobarts put on no evidence explaining the application of the single incident exception to their claim for failure to train on the use of deadly force. However, the Hobarts clearly did offer such evidence. And the district court clearly applied the single incident exception, finding that the use of deadly force "was so obvious that failure to do so could properly be characterized as deliberate indifference." (Internal marks omitted) (citing *City of Canton*, 489 U.S. at 390 n.10). As it is undeniable that the use of deadly force is one of the "recurring situations presenting an obvious potential for such a violation," I would conclude that the district court is correct. *Bryan County*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390).

Both Estrada and Krahn assert that Estrada's use of deadly force was reasonable pursuant to the training, or lack thereof, by Krahn and that he was

following the policy promulgated by Krahn.  Estrada has failed to establish that his use of deadly force was reasonable, and, thus, he is not entitled to summary judgment on the basis of qualified immunity.  It clearly follows that Krahn would obviously be deliberately indifferent in not training Estrada in the appropriate use of deadly force.  *See Bryan County*, 520 U.S. at 409-410 (the "high degree of predictability" that failure to train on the use of deadly force would violate citizens' rights supports an inference of causation – that the "indifference led directly to the very consequence that was so predictable.").

As Estrada has failed to establish that his use of deadly force was reasonable, the evidence that Estrada was in compliance with department policy promulgated by Krahn is sufficient to affirm the district court's denial of summary judgment on this issue.  Moreover, because Krahn's failure to train on the use of deadly force establishes deliberate indifference, he is not entitled to summary judgment on the basis of qualified immunity.  However, based on the record in its entirety, there are several factual disputes.  Again, "if a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material and we lack jurisdiction over the appeal."  *Manis*, 585 F.3d at 843.  Thus, this court also lacks jurisdiction over Krahn's appeal and I would dismiss.