**Opinion issued April 11, 2019**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――――

## NO. 01-18-00249-CV

―――――――――――――

## OSCAR ORTEGA, ROGGIE LAW, STEVEN MURDOCK, AND DON EGDORF, Appellants
## V.
## ALAN PEAN, Appellee

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2016-43519

## MEMORANDUM OPINION

While working off-duty as security officers at St. Joseph Medical Center[1]

("SJMC"), two City of Houston Police Department ("HPD") officers tasered and

―――――――――――――

[1]    SJ Medical Center, LLC d/b/a St. Joseph Medical Center.

shot Alan Pean in his hospital room while he was in the throes of a mental health episode. Pean sued the two officers for the use of excessive force under 42 U.S.C. § 1983 ("section 1983"). He also brought claims against two additional HPD officers for fabrication of evidence under section 1983 and for malicious prosecution and civil conspiracy under Texas common law, alleging the officers worked with SJMC to file charges against him to exonerate their colleagues, HPD, and SJMC.[2]

In this interlocutory appeal,[3] we consider whether the trial court erred in denying the four individual police officers' motion for summary judgment based on qualified immunity from Pean's excessive force and fabrication of evidence claims, and official immunity from his malicious prosecution and civil conspiracy claims.[4]

We reverse and render in part and affirm in part.

**Background**

*The Incident*

---

[2] Pean also sued SJMC, IASIS Healthcare Corporation ("IASIS"), and the HPD, none of whom are parties to this appeal.

[3] TEX. CIV. PRAC. & REM. CODE § 51.014(a)(5) (providing for interlocutory appeal of order that "denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state").

[4] We will refer to Officers Ortega and Law as "Responding Officers," and Sergeant Murdock and Officer Egdorf as "Investigating Officers."

2

On August 26, 2015, Pean, who is bipolar, began experiencing what he described as "a psychotic episode," including delusional thoughts and mania. As the episode escalated, Pean began to believe that there were people after him, and he was about to be captured. He decided he needed to escape his apartment, so he got into his car and began driving. In a moment of clarity, Pean decided he needed his medication, so he began driving to SJMC.

Hospital security video of the street outside of SJMC captured Pean driving up onto a sidewalk and hitting several cars near pedestrians before coming to a stop by crashing into the hospital building.

Pean was taken into SJMC, where he was examined and then admitted for overnight observation. The next morning, SJMC ordered Pean discharged, and a nurse informed him that he should take a shower and get dressed. Pean was still experiencing symptoms of his psychotic episode, including mania and anxiety. According to his testimony, he showered, and although he had come to SJMC with only jeans and a shirt, began looking for a suit to wear because he believed he was going to be on television. When he could not find a suit, he left his room, naked, to ask for help finding one.

Nurse N. Sitompul told him to go back into his room, and he complied. But shortly thereafter, he came out of his room naked again, which he did "about three

3

or four more times," each time returning to his room when told to do so. Although she did not feel threatened by his behavior, Nurse Sitompul called hospital security.

HPD Officers R. Law and O. Ortega received the call asking them to report to Pean's room because he was naked and walking in and out of his room. Willie Jones, a retired pastor and hospital volunteer, accompanied them to Pean's room but stayed outside. When they arrived on Pean's floor, Law and Ortega told Nurse S. Contreras that they had come in response to a call, and she directed them to Pean's room, asking them "to let [Pean] know that it's not appropriate to come out of the room naked."

Pean's narrative is contained in his deposition testimony. According to Pean, Officers Law and Ortega entered the room and began "loudly" asking for things, and "screaming" things that were unintelligible to him. He did not understand that they were security officers. When Pean did not respond, Ortega started clapping his hands together loudly and continued shouting commands at Pean. Law walked out of the room to ask the nurses what Pean's name was, and he returned telling Ortega that it was "Alan." Ortega continued shouting commands at Pean, and after "a certain amount of time," charged at Pean. Pean then "pushed him to the side," and as he began to turn toward the door, Law shot him with a taser. Pean felt "excruciating pain" and roared and screamed. He stumbled, and as he was falling to his left knee, while the taser was still administering shock, Ortega stood up, drew his gun, and

4

shot Pean in the chest. Pean felt a "force jolt [his] body to the right," and the next thing he remembered was coughing up blood and losing consciousness.

Officers Law and Ortega presented evidence describing a markedly different version of what happened in Pean's hospital room. They rely primarily on their accounts of the incident, as reflected in their deposition testimony and sworn police reports.

According to Officer Ortega, when he and Officer Law entered Pean's hospital room, Pean was "playing with the oxygen valves." Ortega asked him to step away from the valves, put his clothes on, and get in bed, but Pean did not pay attention or even look at Ortega. Law went out of the room to ask Pean's name, which Law shouted from the hall to Ortega. Ortega then clapped his hands together and told Pean to stay in the room and get dressed because someone was coming to pick him up. Pean then said to Ortega, "I'm going to get you." Pean clapped his hands and pointed at Ortega. He then charged at Ortega and punched him in the chest. Ortega grabbed Pean by the shoulder and called to Law. According to Ortega, he and Law pushed Pean away from Ortega. Pean then tried to leave the room, but they told him to relax and stop resisting. They tried to grab him but he was too slippery with sweat.

Pean then started punching Officer Ortega, and Ortega punched back. Ortega testified that this happened near the bed, but that they were never on the bed. When

5

Pean hit Ortega in the head, Ortega felt his "skin just pop" and "started blacking out," but he never fell to the floor. When he turned around, Ortega saw that Pean had Officer Law in a headlock and was hitting him. Ortega ran and jumped on Pean's back, and Pean said to him, "Now I'm really going to hurt you. I'm going to hurt you bad." Law walked toward the door, and Pean "bucked" Ortega off of his back. Law called to Ortega to get out of the way and discharged his taser into Pean's chest. Pean "stumbled," "roared," and started pulling on the tasers and "launching" toward Law. While the taser was still administering shock, Ortega shot Pean in the chest with his pistol. Ortega walked out of the room and fainted.

Officer Law testified that when he and Officer Ortega arrived at Pean's room, Pean was "just standing there . . . facing the wall." Ortega asked Law to get Pean's first name, so he left the room and asked a nurse for Pean's first name. When he returned to Pean's room, he saw Pean on Ortega's back, striking his upper body with his fists from behind. Law tried to pull him off of Ortega, but Pean was too slippery with sweat. Pean then hit Law in the face, knocking him to the ground. Ten to fifteen seconds later, Pean began hitting Law in the head from behind. Law then saw Pean and Ortega "tussle[]" and fall to the bed, where both men were punching. Law stood and told Ortega to get up. Ortega pushed Pean off of him and stood up, then fell to one knee. Pean then got off of the bed and ran toward them, at which point Law shot

6

his taser. Pean "screamed," "roared," and "stumbled," but kept moving toward them. While the taser was still firing into Pean, Ortega shot Pean.

Both Officer Law and Officer Ortega testified that Jones remained in the hallway the entire time they were in Pean's room. Ortega testified that the door to Pean's room was always open, but Law could not recall. Both Law and Ortega also testified that Pean used only his fists in the attack; neither officer was struck with a wall fixture, tray table, or piece of furniture.

Hospital security video of the hallway outside of Pean's room captured Officer Ortega crawling on the floor out of Pean's room. Both Law and Ortega were taken to the emergency room, where Ortega was given stitches for the cut on his head, and both Ortega and Law were diagnosed with concussions and discharged that same day.

Nurses Contreras and Sitompul testified that upon seeing Officer Ortega leave Pean's room, they rushed to attend to Pean, who was on the floor with blood coming out of his mouth, taser wires still connected to him. Law handcuffed Pean. Nurse Contreras asked, "Did y'all shoot him," and Law responded that they had not. But the nurses saw the gunshot wound, and rushed Pean into emergency surgery.

Dr. Lawrence Root testified that he visited Pean in SJMC's intensive care unit three days after the incident. He stated that, at that time, Pean did not remember fighting with Officers Law and Ortega, and he was surprised to learn that he had

7

been shot. He also stated that Pean had amnesia and that his memory could return over time.

The summary judgment evidence also included the affidavit of Willie Jones, the SJMC volunteer minister who accompanied Officers Law and Ortega to Pean's hospital room. Jones stated, among other things, that Pean "was picking up pieces of wood, stuff from the walls, swinging and hitting Officer Ortega," and "Officer Ortega did not shoot [Pean] until the guy was getting the best of him and was choking him."

In response to Jones's affidavit, Pean presented evidence that Jones suffered from dementia at the time of the incident. Mary Jones, Willie Jones's wife, testified that Jones was diagnosed with dementia in 2010. Pean also pointed out that Nurse Contreras testified that "once the fight broke out," Jones closed the door, and stayed outside the room for the rest of the encounter, "[h]olding on to the door handle."

***The Investigation***

Sergeant Murdock was the homicide detective in charge of HPD's criminal investigation of the tasering and shooting. Murdock testified that he visited SJMC shortly after the incident occurred. He went to Pean's hospital room, where he observed "articles scattered everywhere," and "a lot of debris." He stated that it "looked like a tornado had gone through" the room. Murdock also went to the

8

emergency room, were Officers Law and Ortega were being treated for their injuries. He spoke with his partner, his lieutenant, and "a nurse or two" "to get the official diagnosis behind the injuries to the officers." Although Ortega testified that he did not speak with Murdock at the hospital, and Law could not recall, Murdock stated that he asked both Law and Ortega "if they were okay, if they were injured." He did not ask them what had happened. As a result of this investigation, Murdock determined that Pean had assaulted Law and Ortega.

Later that day, Sergeant Murdock received Officer Law's "use of force" statement "detail[ing] exactly what had happened." Law's statement did not state that Pean had hit him or Ortega with objects.

The following day, August 28, 2015, Sergeant Murdock telephoned Willie Jones, but he did not record the call. According to Murdock, Jones stated that Pean had assaulted Officers Law and Ortega with tray tables and things he ripped off the wall.

Sergeant Murdock then contacted the Harris County District Attorney's ("DA") Office to inquire whether an Assistant District Attorney ("ADA") would accept charges for two first-degree aggravated assault of a public servant felony charges against Pean. That same day, August 28, 2015, the ADA filed charges against Pean, alleging that he attacked Officers Law and Ortega with deadly weapons, including "a piece of furniture," "his hands," "a wall fixture," and "a tray

table." Law and Ortega later signed sworn statements, neither of which stated that Pean had hit them with tray tables, wall fixtures, or other foreign objects.

The aggravated assault charges were ultimately no-billed by a Harris County grand jury.

We turn next to the reckless driving charges Officer Egdorf recommended and the district attorney ultimately filed on December 15, 2015. Originally, Sergeant Murdock had considered charging Pean with DWI.

On the night of the incident, HPD Officer K. Roy, a drug recognition expert, noted that Pean "[s]howed no signs of intoxication." Approximately one week later, Sergeant Murdock asked Officer Egdorf, who is a drug recognition expert, to "look at this case as a possible DWI case."

Officer Egdorf asked C. Cornelius, an investigator with the DA's Office, to "run a prescription history" for Pean. Cornelius informed Egdorf that Pean had no prescription history. In response, Egdorf emailed Cornelius, "Good.·It makes it hard to explain the Xanax he had in him." Testing on Pean's biological specimens had not been completed when Egdorf sent this email. Egdorf explained that his email chain with Cornelius involved two cases, Pean's and that of another person, and that the comment pertained to the other person.

Officer Egdorf's deposition testimony reflects that for the next three months, he was in contact with corporate executives of IASIS Healthcare Corporation

10

("IASIS")[5] and HPD homicide investigators. In one email to his captain, M. May, he stated, "I spoke to Tim Davidson [IASIS executive] numerous times, explained why we cannot file a case without tox results . . . . He feels the DWI case will save the hospital from having to close or lose funding, so yesterday he asked me to meet with Chief McClelland to explain how serious this case is for the hospital."

In early December 2015, Officer Egdorf received an email from the Houston Forensic Science Center confirming Officer Roy's conclusion on the night of the incident that Pean was not intoxicated when he drove himself to SJMC. Egdorf responded to the email, saying, "I think this report confirms what homicide and St. Joe's were not hoping for though."

On December 7, 2015, Officer Egdorf informed ADA A. Baimbridge of the negative test results, noting, "Looks like mental health crisis is really going to be a factor in this case." Baimbridge left the decision whether to file reckless driving charges to Egdorf and Sergeant Murdock. Egdorf noted in an email to Baimbridge, "My guess is no charge, but I'll do a reckless if they want to."

---

[5] According to Pean's live petition, IASIS is the corporate entity that owns and operates SJMC. IASIS is a defendant in this suit but not a party to this appeal. It was a party to a prior appeal involving the applicability of the Texas Medical Liability Act. *Iasis Healthcare Corp. v. Pean*, No. 01-17-00638-CV, 2018 WL 3059789 (Tex. App.—Houston [1st Dist.] June 21, 2018, pet. denied). *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 74.

On December 15, 2015, the district attorney filed a reckless driving charge against Pean. The charge was later dismissed.

\*\*\*

As a result of his injuries and the charges filed against him, Pean sued SJMC, IASIS, HPD, and Officers Law, Ortega, Murdock, and Egdorf. The officers filed a hybrid no evidence and traditional motion for summary judgment on Pean's excessive force claims against Law and Ortega, and fabrication of evidence, malicious prosecution, and conspiracy claims against Egdorf and Murdock.[6] After a non-evidentiary hearing, the trial court denied the motion.

## Summary Judgment

In five issues, the officers argue that the trial court erred in denying their combined no evidence and traditional summary judgment motion because they are entitled to (1) qualified immunity from Pean's section 1983 excessive force and fabrication of evidence claims, and (2) official immunity from his malicious prosecution and civil conspiracy claims. *See* TEX. R. CIV. P. 166a(c), (i); *Binur v. Jacobo*, 135 S.W.3d 646, 650 (Tex. 2004) (party seeking summary judgment may move for both traditional and no evidence summary judgment).

---

[6] The HPD was also a party to the officers' summary judgment motion, but it did not appeal the trial court's decision.

**A. Standard of Review**

We review de novo a trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Wendt v. Sheth*, 556 S.W.3d 444, 448 (Tex. App.—Houston [1st Dist.] 2018, no pet.). In conducting our review, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Escobar v. Harris Cty.*, 442 S.W.3d 621, 628 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We will only consider as grounds for reversal issues that were "expressly presented to the trial court by written motion, answer or other response." TEX. R. CIV. P. 166a(c).

To prevail on a no evidence summary judgment motion, a movant must establish that there is no evidence of an essential element of the nonmovant's cause of action or affirmative defense. TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn v. Love*, 321 S.W.3d 517, 524 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A movant for traditional summary judgment must establish that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Knott*, 128 S.W.3d at 215–16; *Wendt*, 556 S.W.3d at 448. A defendant moving for traditional summary judgment must negate conclusively at least one essential element of each of the plaintiff's causes of action or establish conclusively each element of an affirmative defense. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014); *Wendt*, 556 S.W.3d at 448. Once the movant meets its burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if reasonable and fair minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

### B. No-evidence Motion

Pean argues that the trial court properly denied the officers' no-evidence summary judgment motion because a no-evidence motion is inappropriate here,

14

where defendants bear a burden of proof on their affirmative defenses of qualified and official immunity. We agree.

As to the state claims, Sergeant Murdock and Officer Egdorf claim they are immune from Pean's malicious prosecution and conspiracy claims under the doctrine of official immunity. Common law official immunity is an affirmative defense, so the officers have the burden to prove each of its elements. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 656–57 (Tex. 1994) (in context of summary judgment motion asserting state law official immunity defense, "an officer must prove" applicability of affirmative defense); *Dorrough v. Faircloth*, 443 S.W.3d 278, 285 (Tex. App.—San Antonio 2014, no pet.) ("[C]ommon-law official immunity is an affirmative defense, and [defendant] has the burden to prove each of its elements."). Accordingly, "a no evidence motion [is] inapt" on official immunity grounds. *Dorrough*, 443 S.W.3d at 285.

With regard to Pean's section 1983 claims, the officers assert that the federal doctrine of qualified immunity shields them from suit. Because, like official immunity, qualified immunity is an affirmative defense, "the defendant bears a burden of proof in establishing a defense of qualified immunity." *Haver v. Coats*, 491 S.W.3d 877, 882 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Escobar*, 442 S.W.3d at 629–30); *cf. Texas Dept. of Criminal Justice v. Thomas*, 263 S.W.3d 212, 220 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (movant's

affidavit and affidavit of nursing director "established that [defendant]'s actions were within her discretionary authority" in support of her qualified immunity summary judgment motion). Therefore, no-evidence summary judgment is inappropriate here. *Haver*, 491 S.W.3d at 882 (a defendant cannot use a no evidence motion for summary judgment to establish an affirmative defense of qualified immunity); *but see Poteet v. Sullivan*, 218 S.W.3d 780, 787 (Tex. App.—Fort Worth 2007, pet. denied) ("The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of qualified immunity; rather, it is sufficient that the movant in good faith pleads that it is entitled to immunity."); *Leo v. Trevino*, 285 S.W.3d 470, 480 (Tex. App.—Corpus Christi 2006, no pet.) (no-evidence motion may raise qualified immunity defense because "[i]t is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity").

Even if a trial court could render no-evidence summary judgment on the affirmative defense of qualified immunity, here we conduct our review under the standard of review for traditional motions, as it is unclear from the officers' motion and appellate briefing which aspects were brought on traditional summary judgment grounds and which were brought on no-evidence grounds. *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 782 (Tex. App.—Dallas 2013, no pet.) ("If a motion does not sufficiently segregate the claims, we review the motion under a traditional standard of review.").

Accordingly, we hold that the trial court properly denied the officers' no-evidence summary judgment motion as to all issues.

**C. Traditional Motion**

The officers contend that the trial court erred in denying their traditional summary judgment motion because they are entitled to qualified and official immunity.

**1.      Qualified immunity for section 1983 claims**

In their first through fourth issues, the officers argue that they are shielded from Pean's excessive force and fabrication of evidence claims under the federal doctrine of qualified immunity.

Pean brings these claims under section 1983, which provides a private right of action against persons acting under color of state law who violate rights secured by the United States Constitution or federal law. *See* 42 U.S.C. § 1983; *Haver*, 491 S.W.3d at 881. Section 1983 is not a source of substantive rights; instead, it creates a cause of action against state actors for enforcement of those rights. *Escobar*, 442 S.W.3d at 629. "A section 1983 claim has two basic elements: the challenged conduct must be committed by a person acting under color of state law, and it must violate a right secured by the Constitution or the laws of the United States." *Id.* (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Qualified immunity is an affirmative defense to a section 1983 claim. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). It protects public officials performing discretionary functions from suit unless their conduct violates a clearly established constitutional right. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Thus, to defeat a claim of qualified immunity, a plaintiff must show that (1) the defendant's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *Escobar*, 442 S.W.3d at 629–30.

In the summary judgment proceedings below, as on appeal, Pean did not dispute that the officers met their initial summary judgment burdens for qualified immunity. *See Haver*, 491 S.W.3d at 882. Thus, the burden shifted to Pean to present evidence sufficient to create a fact issue as to whether the officers' conduct violated the Pean's constitutional rights, which rights were clearly established. *See Escobar*, 442 S.W.3d at 629; *see also Mukoro v. Jackson*, No. 01-17-00466-CV, 2018 WL 1864630, at *3 (Tex. App.—Houston [1st Dist.] Apr. 19, 2018, pet. denied) (mem. op.) (to overcome assertion of official immunity, plaintiff must present evidence to create fact issue as to whether "the official's conduct violated a federal right," and "under the circumstances, that right was sufficiently clear that every reasonable official would have understood that what he is doing violates that right").

On appeal, the officers do not challenge the second prong of the qualified immunity test, whether the constitutional right to be free from excessive force and fabricated evidence under these circumstances is "clearly established." *See Escobar*, 442 S.W.3d at 629–30. Instead, they address only the first prong of the immunity inquiry—whether their conduct violated Pean's right to be free of excessive force and fabricated evidence.

### *Excessive force*

In the officers' first and second issues, the Responding Officers argue that they are entitled to qualified immunity on Pean's section 1983 excessive force claim, which alleges that they violated the Fourth Amendment when they tasered and shot him. *See Escobar*, 442 S.W.3d at 629 (Fourth Amendment prohibits use of excessive force). We disagree, and hold that Pean carried his burden of presenting evidence raising issues of material fact regarding whether the Responding Officers violated his Fourth Amendment rights. *See id.* at 630 (to negate officer's assertion of qualified immunity, plaintiff must present summary judgment evidence demonstrating an issue of material fact as to whether officer's actions violated clearly established constitutional right); *see also Mukoro*, 2018 WL 1864630, at *2 (to survive summary judgment, plaintiff "bears the burden of showing a genuine and material dispute as to whether the official is entitled to qualified immunity" by introducing "evidence sufficient to overcome the defendants' presumptive qualified immunity").

**Officer Law's Use of Force in Tasering Pean**

To prevail on his claim that tasering him constituted excessive force in violation of the Fourth Amendment, Pean must show that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable. *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017). Officer Law addresses only the third element, arguing that Pean failed to raise a fact issue to dispute his summary judgment evidence showing that it was objectively reasonable to taser him.

The objective reasonableness of the force is gauged by balancing the amount of the force used against the need for the force. *Hobart v. Estrada*, 582 F. App'x 348, 355 (5th Cir. 2014). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This determination "requires careful attention to the facts and circumstances of each particular case." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham*, 490 U.S. at 396); *see also Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 747 (S.D. Tex. 2011) (under Federal Rule of Civil Procedure 56, summary judgment is "particularly inappropriate on the question of whether the use of force was excessive").

Officer Law asserts that the summary judgment evidence conclusively proved that a reasonable officer in his position would have feared for his personal safety or the safety of others, and would have deployed his taser on Pean in response to his continued "violent assault" and "active aggression," including charging toward and repeatedly hitting, injuring, and verbally threatening both Responding Officers. Law relies primarily on his and Officer Ortega's testimony, as well as that of Willie Jones, to establish that Pean had violently assaulted him and Ortega before he tasered Pean. Law also relies on the testimony of Nurses Contreras and Sitompul—although both stated unambiguously that they did not observe what transpired inside Pean's hospital room—and treatment records showing that he and Ortega suffered cuts and concussions.

But we are bound to credit Pean's summary judgment evidence, which describes the incident differently. *See Valence Operating Co.*, 164 S.W.3d at 661 (reviewing court must take as true all evidence favorable to nonmovant and we indulge every reasonable inference and resolve any doubts in nonmovant's favor); *Escobar*, 442 S.W.3d at 631 (same).

Before reviewing Pean's evidence, we address the Responding Officers' assertion that Pean's testimony is unreliable and should be disregarded as a matter of law. We note here that while the rules governing summary judgment require that testimonial evidence of an interested witness be "clear, positive and direct, otherwise

21

credible and free from contradictions and inconsistencies" in order for a summary judgment to be based on such evidence, "there is no such strict requirement for testimonial evidence used to defeat summary judgment." *Kirkwood v. Jefferson Cty.*, No. 09-16-00337-CV, 2017 WL 4319771, at *2 (Tex. App.—Beaumont Sept. 28, 2017, no pet.) (mem. op.) (citing Tex. R. Civ. P. 166a(c) ("A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."); *see also Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 39 (Tex. App.—San Antonio 2015, pet. denied) ("Although Appellants are interested witnesses, their affidavits—when examined to determine whether they raise a fact issue sufficient to defeat Appellees' traditional motion—are not required to be 'clear, positive and direct, otherwise credible and free from contradictions and inconsistencies.'"); *De La Morena v. Ingenieria E Maquinaria De Guadalupe, S.A.*, 56 S.W.3d 652, 658 (Tex. App.—Waco 2001, no pet.) ("By its express language, the [interested-witness] part of Rule 166a(c) relied on by [movant] does not apply to a non-movant's affidavit. That part specifically refers to the evidence on which a summary judgment 'may be based.'").

Relying on a U.S. Supreme Court case applying the Federal Rules of Civil Procedure, the Responding Officers first argue that this court should not take as true

Pean's version of the facts for purposes of ruling on their motion for summary judgment because the video evidence "showing Officer Ortega crawling on the floor in the hallway after being hit by Pean" "blatantly contradicts" Pean's testimony. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by [video evidence], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also* FED. R. CIV. P. 56(c) (at summary judgment stage, facts must be viewed in light most favorable to nonmoving party only if there is "genuine" dispute as to those facts).

Even if we were bound by federal case law applying a Federal Rule of Civil Procedure, we would not disregard Pean's testimony based on the video, which provides no information as to what happened inside of Pean's hospital room, and thus does not favor one account over the other or provide the clarity necessary to resolve the factual dispute presented by the parties' conflicting accounts. *See Darden v. City of Fort Worth*, 880 F.3d at 722, 730 (5th Cir. 2018) (videos that did not show "whether [plaintiff] got onto the ground when he was commanded to do so" did not provide "so much clarity that a reasonable jury could not believe" plaintiff's testimony that he "was compliant with the officers' commands and was thrown to the ground by police").

23

Next, the Responding Officers argue that Pean's testimony should be disregarded because, under Texas Rule of Evidence 601(a)(1), "he was not competent at the time of the incident and therefore not competent to testify about it." Rule 601(a)(1) provides that "[a] person who is now insane or was insane at the time of the events about which the person is called to testify" is not competent to be a witness. TEX. R. EVID. 601(a)(1). Witness competency is a preliminary question for the trial court to determine, and we will not disturb the trial court's ruling on appeal unless an abuse of discretion is shown. *Id.* 104(a).

Generally, every person is presumed competent to testify. TEX. R. EVID. 601(a). The issue of competency under Rule 601 pertains to whether a witness has the ability to perceive the relevant events, recollect the events, and adequately narrate his recollection. *In re Commitment of Edwards*, 443 S.W.3d 520, 528 (Tex. App.—Beaumont 2014, pet. denied); *Kokes v. Angelina Coll.*, 148 S.W.3d 384, 389 (Tex. App.—Beaumont 2004, no pet.). The party attacking a witness's competency bears the burden of proving the witness's incompetency. *Edwards*, 443 S.W.3d at 528; *Kokes*, 148 S.W.3d at 390; *Handel v. Long Trusts*, 757 S.W.2d 848, 854 (Tex. App.—Texarkana 1988, no writ).

The Responding Officers argue that Pean's testimony that he was in a "psychotic delusional state" at that time of the incident conclusively proves that he was "insane" at the time of the incident and thus incompetent to testify as to it. But

a mental infirmity does not necessarily render a witness incompetent to testify. *Edwards*, 443 S.W.3d at 528; *Kokes*, 148 S.W.3d at 390.

Because the summary judgment record does not conclusively establish that Pean was insane at the time of the incident, we reject the Responding Officers' argument that we should disregard his testimony. *See Kokes*, 148 S.W.3d at 390 ("If a witness meets the requirements of competency, though the issue may be close, the factfinder should be allowed to hear the testimony and make the determination of how much weight is to be given to the testimony in light of a mental infirmity."). It is for the trier of fact to determine Pean's credibility and the weight to be given it. *See id.*; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.").

Relatedly, the Responding Officers argue that Pean's testimony should be disregarded as unreliable because, while he was still in the intensive care unit at SJMC, he told Dr. Root that he did not remember fighting with them and that he was surprised to learn he had been shot. But the Responding Officers fail to mention that Root also testified that he believed Pean could get his memory back over time.

The Responding Officers' efforts at discrediting Pean's evidence are unavailing, as it is not our task to determine whether Pean's testimony is credible or consistent, but only whether it is sufficient to create a fact issue. *See e.g.*, *Huckabee*

25

*v. Time Warner Entm't Co.*, 19 S.W.3d 413, 422 (Tex. 2000) ("Texas law has always emphasized that trial courts must not weigh the evidence at the summary judgment stage. Instead, a trial court's only duty at the summary judgment stage is to determine if a material question of fact exists.") (internal citations omitted); *see also Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) ("If the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate."); *Digby v. Texas Bank*, 943 S.W.2d 914, 923 (Tex. App.—El Paso 1997, writ denied) ("In evaluating whether the summary judgment evidence raises genuine issues of material fact, we note initially that we cannot assess the credibility of witnesses."). Thus, if a summary judgment motion "involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." *Schoen v. Redwood Constr., Inc.*, No. 01-09-00371-CV, 2011 WL 478563, at *2 (Tex. App.—Houston [1st Dist.] Jan. 31, 2011, no pet.) (mem. op.) (citing *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965)). Assertions that a nonmovant's testimony is incredible because, for example, it is "contrary to common sense, experience and logic," *Digby*, 943 S.W.2d at 923, or "confusing and weak," and inconsistent with prior testimony, are appropriate for the jury, and cannot affect an appellate court's assessment of the summary judgment motion. *Cortez v. Fuselier*, 876 S.W.2d 519, 521–22 (Tex. App.—Texarkana 1994, writ denied). Adherence to the well-

established summary judgment standard is pivotal to our review: "there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller*, 168 S.W.3d at 824. We will not disregard the evidence supporting the motion. *Id.*

Pean, who was unarmed and had committed no crime when Officers Law and Ortega arrived in his hospital room, testified that he was not evasive and had not threatened or assaulted either officer until he pushed Ortega defensively. Whether or not this version of events is credible is an issue for the jury; the only question before us is whether a fact issue exists. *See Huckabee*, 19 S.W.3d at 422; *Casso*, 776 S.W.2d at 558.

In evaluating whether Officer Law acted reasonably under Pean's facts, we may consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Romero v. City of Grapevine*, 888 F.3d 170, 177 (5th Cir. 2018) (quoting *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013)). Here, there is no suggestion that the Responding Officers reported to Pean's room because they believed he had committed any crime, much less a serious one. And although, according to Pean, he pushed Ortega to defend against his charge, even under the Responding Officers' version of the facts Law

27

had not been attempting to arrest Pean when he deployed his taser. Indeed, Pean's testimony is that he was not attempting to leave the room when Law tasered him. Thus the first and third factors weigh against Law.

The second factor, which asks whether Pean posed an immediate threat to Officer Law's safety or the safety of others, also weighs against the reasonableness of Law's actions. Under Pean's version of the events, he pushed Ortega defensively, and had not charged or attacked either officer when Law tasered him. And while Pean concedes that, initially, he was not wholly compliant with the Responding Officers' commands due to his delusional state, tasering him was unreasonable here where there is no evidence in the record that Law's actions prior to deploying his taser were "measured and ascending" in correlation with Pean's noncompliance. *See, e.g.*, *Davis v. City of Port Aransas*, No. 2:14-CV-80, 2015 WL 758278, at *4–5 (S.D. Tex. 2015) ("[N]o reasonable officer could have concluded that immediately tasing Plaintiff for 15 to 20 seconds without warning or other 'measured and ascending' responses was reasonable," where plaintiff did not pose threat to safety of officers or others, and did not actively resist arrest or attempt to evade arrest, but merely stated that he did not want to go to jail in response to officer's single instruction to turn around.); *cf. Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (officer's use of taser after repeated commands to turn around not unreasonable, where officer first "responded with verbal commands and attempted to grab

28

[plaintiff]'s arm, before resorting to a taser, which . . . he applied and withdrew very quickly"); *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (officers' actions in tasering plaintiff were reasonable because they "reacted with measured and ascending responses—verbal warnings, pepper spray, hand-and arm-manipulation techniques, and then the use of a Taser").

Because Pean presented evidence that he did not attempt to flee, was not physically combative (beyond protecting himself), and did not pose a direct threat to the Responding Officers, we conclude that he has raised a genuine issue of material fact; it is for the jury to determine whether a reasonable officer in Law's position would have believed that Pean posed such danger as to warrant tasering him. *See Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018) ("[T]he officers lacked reason to believe that [plaintiff] committed a crime, sought to flee, or posed a threat of danger to them . . . . [T]he evidence is sufficient to show that [the officer] violated [plaintiff]'s Fourth Amendment right to be free of excessive force."); *Hobart*, 582 F. App'x at 355 (objective reasonableness of force determined by "balancing the amount of the force used against the need for the force").

**Officer Ortega's Use of Deadly Force in Shooting Pean**

Deadly force is a subset of excessive force. *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 487–88 (5th Cir. 2001) Its intrusiveness is "unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "[W]hen an officer uses deadly force,

the sole inquiry is whether 'the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others' at the moment the officer used deadly force; if not, the use of 'deadly force violates the Fourth Amendment.'" *Hatcher v. Bement*, 676 F. App'x 238, 243 (5th Cir. 2017) (quoting *Bazan*, 246 F.3d at 492).

Officer Ortega argues that the summary judgment evidence conclusively established that a reasonable officer in his position would have shot Pean when he continued charging toward him and Officer Law while the taser was still delivering shock into Pean's body.

Having reviewed the evidence in the light most favorable to Pean, we conclude that it is for the jury to determine whether Officer Ortega had probable cause to believe that Pean, unarmed, naked, and still receiving electric charge from Officer Law's taser, posed a threat of serious physical harm sufficient to warrant the use of deadly force. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) ("Specifically with regard to deadly force . . . it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him [dead].'" (quoting *Garner*, 471 U.S. at 11).

Accordingly, we hold that, on this record, Pean has demonstrated that there is at least a fact issue for the jury as to the Responding Officers' claim of qualified

immunity with regard to his section 1983 excessive force and deadly force claims. *See* Tᴇx. R. Cɪᴠ. P. 166a(c); *Escobar*, 442 S.W.3d at 637–38.

We overrule the officers' first and second issues.

### *Fabrication of evidence*

In the officers' third issue, the Investigating Officers argue that they are entitled to qualified immunity from Pean's section 1983 fabrication of evidence claim, in which Pean alleges that they recommended false charges against him. This is essentially a malicious prosecution claim, which is not actionable under § 1983 absent allegations that the Investigating Officers "violated specific constitutional rights in connection with" the claim that they caused charges to be filed without probable cause. *See Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (claimant must allege violation of "specific constitutional rights in connection with a malicious prosecution"); *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003) ("[C]ausing charges to be filed without probable cause will not without more violate the Constitution."). Because Pean's petition alleges that he was "seized" as a result of the charges, we construe his claims to include allegations of Fourth Amendment violations.[7] To prevail on this claim, Pean must show that the

---

[7] We do not address Pean's vague and cursory allegation that the Investigating Officers' actions violated the Fourteenth Amendment, as substantive due process may offer protection only in cases "where there is no more specific constitutional protection available." *Cole v. Carson*, 802 F.3d 752, 772 (5th Cir. 2015), cert. granted, judgment vacated sub nom. *Hunter v. Cole*, 137 S. Ct. 497 (2016), and

Investigating Officers caused him to be seized without probable cause. *See Whittington v. Maxwell*, 455 F. App'x. 450, 458 (5th Cir. 2011) (with regard to pretrial confinement, "the sole issue [under the Fourth Amendment] is whether there is probable cause" for the deprivation of liberty) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975)).

To avoid summary judgment, Pean had to present evidence raising an issue of material fact regarding whether the Investigating Officers had probable cause to support recommending the felony aggravated assault on a police officer and reckless driving charges which ultimately lead to his allegedly illegal seizures. *See Escobar*, 442 S.W.3d at 630 (to negate officer's assertion of qualified immunity, plaintiff must present summary judgment evidence demonstrating issue of material fact as to whether officer's actions violated a clearly established constitutional right); *see also Mukoro*, 2018 WL 1864630, at *2 (to survive summary judgment, plaintiff "bears the burden of showing a genuine and material dispute as to whether the official is entitled to qualified immunity" by introducing "evidence sufficient to overcome the defendants' presumptive qualified immunity"). Probable cause exists where the facts

---

opinion reinstated in part, 905 F.3d 334 (5th Cir. 2018); *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" (citation omitted)).

and circumstances known to law enforcement officers are "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Marcopoulos v. State*, 538 S.W.3d 596, 602 (Tex. Crim. App. 2017) (citation omitted). To determine whether an officer has probable cause, we consider the totality of the circumstances. *See Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). Probable cause is viewed objectively. *See id.* at 27.

The instrument charging Pean with aggravated assault of a peace officer states that he unlawfully, intentionally, and knowingly threatened the Responding Officers with imminent bodily injury by using and exhibiting a deadly weapon, including "a piece of furniture," "his hands," "a wall fixture," and "a tray table." *See* TEX. PENAL CODE §§ 22.01(a)(2) (assault), 22.02(a)(2) (aggravated assault). According to Sergeant Murdock, before recommending the charges, he visited the scene, learned of the Responding Officers' injuries, reviewed Law's incident report describing the incident, and interviewed witness Willie Jones.

Pean argues that an issue of material fact exists as to whether Sergeant Murdock had probable cause to include in the assault allegations that Pean used furniture as a deadly weapon against the Responding Officers. Pean points out that Officer Law's incident report, which Murdock had reviewed, did not state that Pean attacked him and Officer Ortega with furniture. But Willie Jones told Murdock that he had, and Murdock, who was aware that the Responding Officers had suffered

33

abrasions and concussions, had observed Pean's hospital room, which he stated "looked like a tornado had gone through" it. Taking into account all of the facts and circumstances known to him at the time, we conclude that Murdock had probable cause to believe that Pean had committed aggravated assault. *See Wiede*, 214 S.W.3d at 25. Murdock was therefore entitled to summary judgment based on qualified immunity from Pean's claim that he fabricated evidence of aggravated assault.

The reckless driving charge states that Pean unlawfully recklessly drove a vehicle in willful and wanton disregard for the safety of persons and property, by driving on a sidewalk and hitting parked cars. *See* TEX. TRANSP. CODE § 545.401(a). Officer Egdorf recommended the charge "based on the video of the crash" and "the damage that was done in the crash."

Pean asserts that his summary judgment evidence created fact issues regarding probable cause. According to Pean, the record evidence shows that Officer Egdorf misrepresented to the district attorney's office that Pean had drugs in his system, and "kept a running conversation with multiple IASIS corporate executives" about the damage that would be done to SJMC if Pean were to file suit. This evidence goes to Egdorf's subjective intent, which is irrelevant to the probable cause inquiry. *See Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) ("The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer."). We conclude that the video evidence would justify a reasonable officer in

believing that Pean drove his car in willful and wanton disregard for the safety of persons and property. Egdorf was therefore entitled to summary judgment based on qualified immunity from Pean's claim that he fabricated evidence of reckless driving.

We sustain the officers' third issue.

## 2. Official Immunity

In the officers' fourth and fifth issues, the Investigating Officers argue that official immunity shields them from Pean's state law malicious prosecution and civil conspiracy claims, which allege that they conspired together with IASIS to bring false criminal charges against him to exonerate their colleagues, HPD, and SJMC.[8]

The Texas common law doctrine of official immunity protects government employees from civil liability for conduct that otherwise would be actionable. *Martinez v. Harris Cty.*, 526 S.W.3d 557, 562 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 726 (Tex. App.—

---

[8] *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006) (elements of malicious prosecution claim: (1) a criminal prosecution was commenced against plaintiff; (2) defendants initiated or procured that prosecution; (3) the prosecution terminated in plaintiff's favor; (4) plaintiff was innocent of the charges; (5) defendants lacked probable cause to initiate the prosecution; (6) defendants acted with malice; and (7) plaintiff suffered damages); *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (setting out elements of conspiracy); *BP Auto., L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 573 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (elements of civil conspiracy claim: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result).

Houston [1st Dist.] 2000, pet. denied). It is an affirmative defense that applies when government employees discharge discretionary duties in good faith and act within the course and scope of their authority. *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 642–43 (Tex. 2015) (per curiam); *Martinez*, 526 S.W.3d at 562. To prevail, the Investigating Officers must conclusively establish that they recommended the aggravated assault and reckless driving charges in discharge of their discretionary duties, in good faith, and in the course and scope of their authority. *See Bonilla*, 481 S.W.3d at 642–43; *Martinez*, 526 S.W.3d at 562 (setting out elements of official immunity defense); *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994) (defendant must conclusively prove each element of affirmative defense of official immunity).

Here, the only issue is whether the Investigating Officers' summary judgment evidence conclusively established the "good faith" element of the defense, *see Bonilla*, 481 S.W.3d at 643, i.e., that reasonably prudent officers, under the same or similar circumstances, could have believed that their actions were justified based on the information they possessed when the conduct occurred. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426 (Tex. 2004).

If the Investigating Officers present sufficient proof to meet their initial summary judgment burden on the issue of good faith, Pean must then controvert their proof with a showing elevated from that usually required of nonmovants in

summary judgment proceedings. Pean must do more than show that a reasonably prudent officer could have acted differently; he must show that no reasonable person in the Responding Officers' positions could have thought the facts were such that they justified their acts. *See Chambers,* 883 S.W.2d at 657. "This test of good faith does not inquire into 'what a reasonable person would have done,' but into 'what a reasonable [person] could have believed.'" *Ballantyne*, 144 S.W.3d at 426 (quoting *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002)). "By adopting an objective test, the court defined good faith 'in a counterintuitive fashion' but also made it easier for a public official to obtain summary judgment." *Tex. Dep't of Public Safety v. Rodriguez*, 344 S.W.3d 483, 490 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

As we held above, the evidence established that Sergeant Murdock and Officer Egdorf had probable cause to recommend the aggravated assault and reckless driving charges. They therefore met their burden to prove that they acted in good faith. *See Nunez v. Jimenez*, No. 04-07-00403-CV, 2007 WL 4320822, at *5 (Tex. App.—San Antonio Dec. 12, 2007, no pet.) (mem. op.) (good faith element of official immunity established by showing probable cause); *Lang v. City of Nacogdoches*, 942 S.W.2d 752, 764 (Tex. App.—Tyler 1997, writ denied) (officers who had sufficient probable cause to arrest defendants were therefore entitled to qualified immunity against defendants' false arrest and imprisonment claims); *Harris Cty. v. Ochoa*, 881 S.W.2d 884, 888 (Tex. App.—Houston [14th Dist.] 1994,

writ denied) ("The deputies' motion for summary judgment is supported by affidavits showing that they acted with probable cause, and therefore, good faith, when they pursued the suspect.").

We now consider whether Pean raised a fact issue as to good faith. As noted above, Pean's burden is much higher than the Investigating Officers' burden—he must show that no reasonable officer in Murdock's and Egdorf's positions could have believed that the circumstances justified their conduct. *See Telthorster*, 92 S.W.3d at 466–67. Here again, Pean argues that the Investigating Officers recommended the charges against him to "provide cover" for their colleagues, HPD, and SJMC for tasing and shooting him. But any evidence of the Investigating Officers' subjective intent is irrelevant to the good faith inquiry for official immunity. *Ballantyne*, 144 S.W.3d at 428. ("[Plaintiff] attempted to show that [defendants'] actions were improperly motivated . . . . Although we do not condone the negative comments by [defendants], the objective standard of good faith does not permit an inquiry into what subjectively could have motivated the [defendants'] decision."); *Rodriguez*, 344 S.W.3d at 489 n.2 (officers' subjective feelings, "whether they demonstrate subjective good faith or bad faith, are not relevant" to the official immunity inquiry). "Indeed, if a defendant only produces evidence of his or her subjective good faith, summary judgment is inappropriate." *Rodriguez*, 344 S.W.3d at 489 n.2. Because Pean did not present any objective evidence of bad faith,

38

we hold that the Investigating Officers established their affirmative defense of official immunity as a matter of law.

Pean has not identified any objective evidence to show that a reasonably prudent officer could not have believed that he assaulted the Responding Officers with a deadly weapon or drove recklessly. He therefore failed to raise a fact issue to survive summary judgment on his malicious prosecution claim based on the Investigating Officers' affirmative defense of official immunity. *See Ballantyne*, 144 S.W.3d at 426.

As to Pean's conspiracy claim, it is derivative of, and thus dependent upon, his malicious prosecution claim. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *Frankoff v. Norman*, 448 S.W.3d 75, 86–87 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (elements of conspiracy include two or more persons, object to be accomplished, meeting of minds on object or course of action, one or more unlawful, overt acts, and damages as proximate result). Because Sergeant Murdock and Officer Egdorf are immune from Pean's malicious prosecution claims, they are also immune from his conspiracy claim. *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 94 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (where defendant's liability for alleged underlying tort "is foreclosed as a matter of law . . . there is no claim for conspiracy").

Because the Investigating Officers conclusively proved their official immunity defense, they were entitled to summary judgment on Pean's malicious prosecution and conspiracy claims.

We sustain the officers' fourth and fifth issues.

## Conclusion

We reverse the portion of the trial court's summary judgment order that denied summary judgment on Pean's section 1983 fabrication of evidence claim and state law malicious prosecution and civil conspiracy claims against Sergeant Murdock and Officer Egdorf. We render judgment that Pean take nothing on those claims. We affirm the remainder of the trial court's order denying summary judgment, and we remand to the trial court for further proceedings.


Peter Kelly
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.