# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 16, 2024

Lyle W. Cayce
Clerk

No. 23-50894

———————

JACK MILLER; ANNABEL CAMPBELL; MATTHEW PESINA; LISA PESINA; M. P., *a Minor*; J. G., *a Minor*,

*Plaintiffs—Appellants*,

*versus*

CHIEF JOSEPH SALVAGGIO, *in his individual and official capacities*; OFFICER JIM WELLS, *Detective, in his individual and official capacities*; DAVID ANDERSON, *Lieutenant, in his individual capacity*; RUBEN SAUCEDO, *Former Leon Valley Captain, in his individual capacity*; JOHNNY VASQUEZ, *Officer, in his individual capacity*; TERRY BROOKS, *Detective, in his individual capacity*; ALEX KING, *Detective, in his individual capacity*; RUDOLFO MUNOZ, *Detective, in his individual capacity*; ERIKA RIVERA, *Officer, in her individual capacity*,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-642

———————————————————————

Before SMITH, CLEMENT, and HIGGINSON, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:[*]

———————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-50894

This appeal arises from Plaintiff-Appellant Jack Miller's visit to City Hall in Leon Valley, Texas. In May 2018, Miller, a Second Amendment activist, entered City Hall—a multi-use municipal building that contains a court—with a device that resembled a Glock handgun, openly visible and holstered to his hip. Later that same day, after police officers executed a search and arrest warrant at Miller's residence, Miller was arrested for bringing a prohibited weapon to a government court in violation of Texas Penal Code Section 46.03, but the charges were later dropped for lack of evidence. Miller, Annabel Campbell (Miller's spouse), M.P. and J.G. (Miller's grandchildren), Matthew Pesina (Miller's son), and Lisa Pesina (Miller's daughter-in-law) (collectively, Plaintiffs) brought 42 U.S.C. § 1983 claims against various officers, alleging that the officers violated their (1) Fourth Amendment rights to be free from search or seizure absent probable cause and (2) First Amendment rights to protest without retaliatory arrest and prosecution. The district court granted summary judgment for the officers on qualified-immunity grounds.

Plaintiffs raise two issues on appeal: (1) whether the district court erred by granting the officers qualified immunity as to Plaintiffs' Fourth Amendment claims and (2) whether the district court erred by granting the officers qualified immunity as to Plaintiffs' First Amendment claims. Because a reasonable officer could have believed that Miller had brought a real firearm into a government court, the warrant application was reasonable and the officers were entitled to qualified immunity. Accordingly, we AFFIRM.

## I.

## A.

Leon Valley City Hall—a multi-use municipal building that contains a court—had signs at the building's entrance informing guests that they

2

could not bring weapons into the building and that carrying a firearm into the building would violate various sections of the Texas Penal Code.[1]

On May 31, 2018, Miller visited City Hall to file a complaint regarding what he perceived as the unlawful enforcement by Leon Valley of sections of the Texas Penal Code that prohibited the carrying of weapons in the building, including by licensed handgun holders. Tex. Penal Code § 46.01(3) (West 2017). Attached to his hip and holstered was an item that resembled a Glock firearm. Miller later testified that the item was a blue rubber gun that he spraypainted black so that the device would resemble a real Glock.

Upon reaching the front of the metal-detector line, Miller asked Officer Erika Rivera—who was operating the metal-detector wand— "what's in [the building]." Officer Rivera informed him that the building housed City Hall, the police department, the city manager's office, animal control, and (after further inquiry) a court. Officer Rivera saw Miller openly carrying what she recognized as a Glock firearm. When Miller asked to speak with someone to file a complaint about the Texas Penal Code signs, Officer Rivera signaled Officer Jim Wells to come over.

Miller informed Officer Wells that he intended to file a complaint about the signs. Officer Wells responded that he would not take Miller's

---

[1] One sign, located on either side of the building entryway, simply stated "[n]o weapons." Another, affixed to the window at the building's entrance, again stated "no weapons" but also advised that, "pursuant to Texas Penal Code Section 46.03," a person commits a third-degree felony by "possess[ing] a firearm or prohibited weapon on the premises of any government court or offices utilized by the court." The Texas Penal Code defines "firearm" as "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance." Tex. Penal Code § 46.01(3) (West 2017). Other signs affixed to the entryway window apprised the public that carrying a handgun on the premises would violate either Section 30.06 or Section 30.07 of the Texas Penal Code, which define trespass by a licensed holder carrying a concealed or open-carry gun, respectively.

complaint and ordered Miller to step outside because "no firearms were allowed" in the building. Officer Wells refused to take down the signs, instructed Miller to contact the Texas Office of the Attorney General (OAG), then walked away toward the parking lot.

After Wells departed, Miller noticed Lieutenant David Anderson standing in the door to the building and told Lieutenant Anderson that he came to City Hall to discuss the signs. Lieutenant Anderson responded that Leon Valley was compliant with the law, advised Miller that he should contact the OAG to lodge a complaint, and then left. Miller subsequently returned to his car in the nearby parking lot and deposited his device in the car's glove compartment. Meanwhile, Lieutenant Anderson and Officer Rivera convened with Sergeant Eddie Gonzales (an officer who saw Miller in City Hall) and Officer Michael Tacquard (another officer who saw Miller with the gun holstered on his hip) to discuss the events that transpired with Miller.

Miller later returned to City Hall to file his complaint. After Miller entered the building (this time without the real or fake gun), Officer Rivera wanded him for the first time and then he proceeded to the receptionist's desk to fill out a complaint form. While at the receptionist's desk, Miller told his friend that if the police searched his car, they would discover the gun was rubber. The footage does not show whether any officer could have overheard Miller's statement. Lieutenant Anderson joined Miller at the front counter and after a brief discussion, retrieved Miller's completed form. When Miller insisted that Lieutenant Anderson return the form, he did, and Miller subsequently handed the form to Captain Ruben Saucedo after a brief conversation. Miller then left City Hall.

No. 23-50894

During both of Miller's visits to City Hall, his friend and fellow activist filmed the events and Miller also recorded the events on a body-worn device.

**B.**

Later that same day, Lieutenant Anderson informed the Leon Valley Police Chief Joseph Salvaggio about Miller's visit to City Hall. Chief Salvaggio held a meeting with Captain Saucedo, Lieutenant Anderson, Officer Wells, and Sergeant Gonzales and directed his officers to charge Miller with the felony offense of having a firearm in a prohibited place (an office utilized by a court) under Section 46.03 of the Texas Penal Code. Chief Salvaggio also directed his officers to prepare affidavits in support of search and arrest warrants.

At around 5:00 p.m. that same day, Sergeant Gonzales assisted Detective Alex King in writing the probable-cause affidavits for the search and arrest warrants. Both affidavits stated, *inter alia*, that the officers stopped Miller in the City Hall lobby with a "clearly visible" and holstered firearm. Lieutenant Anderson, Captain Saucedo, and Chief Salvaggio approved the affidavits, and then Sergeant Gonzales met with a magistrate judge, who approved the warrants around 10:30 p.m. that evening.

Police officers waited approximately one-and-a-half hours until Miller returned home and then executed the arrest and search warrants shortly after midnight on June 1, 2018. During the search, the officers handcuffed Miller, and Chief Salvaggio allegedly laughed at him and thanked him for visiting Leon Valley. The officers then arrested Miller and took him into custody, and he was released the following day.

No. 23-50894

## C.

On August 20, 2018, a Bexar County grand jury indicted Miller for violating Section 46.03 of the Texas Penal Code by intentionally possessing a firearm on the premises of a governmental court and office utilized by the court. The prosecution ultimately terminated in Miller's favor for lack of evidence.

On May 28, 2020, Plaintiffs filed a lawsuit in the United States District Court for the Western District of Texas, San Antonio Division, against various police officers, police departments, and a magistrate judge. In the third amended complaint, Plaintiffs brought claims against Defendants[2] and other officers who are no longer parties to the case, under 42 U.S.C. § 1983, alleging that the officers violated Plaintiffs' (1) Fourth Amendment rights by seeking warrants absent probable cause and (2) First Amendment rights by retaliating against Miller for his protest activity. Both sides moved for summary judgment. Defendants, in support of their motion, cited qualified immunity.

On August 23, 2023, the district court denied Plaintiffs' motion for summary judgment and granted Defendants' motion on the basis of qualified immunity, thereby dismissing the suit. The district court held that Defendants were entitled to qualified immunity "[b]ecause Plaintiffs fail[ed] to create a genuine dispute of material fact as to the Defendant officers' good faith showing of probable cause" and there was "insufficient summary judgment evidence to support Plaintiffs' suggestion, under the first prong of the qualified immunity analysis, that Defendant officers violated a statutory

---

[2] Defendants are defined herein as Chief Salvaggio, Officer Wells, Lieutenant Anderson, Captain Saucedo, Officer Johnny Vasquez, Detective Terry Brooks, Detective King, Detective Rudolfo Munoz, and Officer Rivera.

or constitutional right." Plaintiffs filed a motion to alter or amend the district court's judgment, which the district court denied on November 13, 2023. Plaintiffs then timely appealed.

## II.

This court reviews de novo a district court's grant of summary judgment. *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021). We view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020). Nonetheless, "[a] court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

When the movant asserts a qualified-immunity defense, the "defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Nevertheless, although the burden shifts to the plaintiff, "all inferences are drawn in his favor." *Id.*

## III.

Plaintiffs raise two issues on appeal: (1) whether the district court erred by granting the officers qualified immunity as to Plaintiffs' Fourth Amendment claims and (2) whether the district court erred by granting the officers qualified immunity as to Plaintiffs' First Amendment claims. We address Plaintiffs' argument as to the Fourth Amendment claims first.

**A.**

"Qualified immunity protects 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "This demands a two-step analysis: whether a constitutional right was violated and whether the allegedly violated right was 'clearly established.'" *Id.* (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 322–23 (5th Cir. 2002) (en banc) (per curiam)). The doctrine encompasses "all but the plainly incompetent or those who knowingly violate the law." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (internal quotations omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To overcome qualified immunity, the plaintiff must show that the law "so clearly and unambiguously prohibited [the violative] conduct that '*every* reasonable official would understand that what he is doing violates the law.'" *Id.* (cleaned up) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 739–41 (2011)); *accord Bonilla v. Orange County*, 982 F.3d 298 (5th Cir. 2020). To make such a showing, the plaintiff need not locate a case "directly on point" but must demonstrate that "existing precedent . . . placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 77–79 (2017) (internal quotations omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Whether an officer is entitled to qualified immunity turns on the "objective legal reasonableness" of the action, *Harlow*, 457 U.S. at 819, not subjective motivations.

When a plaintiff alleges that an officer made misstatements in a warrant application, the officer is entitled to qualified immunity unless the plaintiff can show that the affiant's misstatements or omissions were material and "of 'such character that no reasonable official would have submitted

[them] to a magistrate.'" *Morin v. Caire*, 77 F.3d 116, 122 (5th Cir. 1996) (quoting *Hale v. Fish*, 899 F.2d 390, 402 (5th Cir. 1990)); *accord Briggs*, 475 U.S. at 344–45; *United States v. Leon*, 468 U.S. 897, 923 (1984). A warrant application objectively violates the Fourth Amendment if it contains (1) "a false statement [made] knowingly and intentionally, or with reckless disregard for the truth," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *accord Garcia v. Orta*, 47 F.4th 343, 352 (5th Cir. 2022).

**B.**

Plaintiffs argue that the statements in the warrant application lacked probable cause because (1) the officers did not offer "material evidence that the device holstered on Miller's hip was a firearm, or that it was in *plain view*"; (2) the officers' failure to take steps during Miller's visit to either confirm or dispel their supposed reasonable suspicion that the gun was real renders the warrant application unreasonable; (3) the author of the investigatory report and the affiant of the warrant application lacked personal knowledge of the facts underpinning the affidavit and instead relied on "hearsay within hearsay" to support the application; (4) the officers omitted allegedly exculpatory facts (namely, that Miller re-entered City Hall, passed security, and was not detained or searched) and made "bare bones" assertions in the warrant; (5) any information obtained during Miller's visit to City Hall would be stale by the time the judge approved the warrant application; and (6) the officers clearly had it out for Miller, so that impure motivation taints the warrant application and ensuing prosecution of Miller.[3]

---

[3] Miller appears to reassert in his reply brief an argument that he raised at the district court—that the City Hall lobby is not "the premises of any government court" within the meaning of Texas Penal Code Section 46.03. But Miller abandoned that

No. 23-50894

We decline to overturn the district court's granting of summary judgment to Defendants on these grounds. Based on the video evidence, a reasonable officer could have concluded that Miller was carrying a real handgun in a prohibited place.

## 1.

Clear video evidence—which this court is empowered to privilege over Miller's allegations that the gun was fake, *see Scott*, 550 U.S. at 380–81[4]—shows that an object resembling a gun was visible to the officers. The district court was right: "The video evidence is not sufficient to determine whether the gun is real; however, it is sufficient to establish the Defendant officers were objectively reasonable in so believing." *Miller v. Salvaggio*, No. SA-20-CV-00642, 2023 WL 5435619, at *6 (W.D. Tex. Aug. 23, 2023).

Contrary to Miller's allegations, the video evidence also reflects that at no point during the visit did he notify the officers that the gun was fake. Quite the opposite. Miller declined to correct Officer Wells when Officer Wells directed Miller to step outside with his gun and informed him that he cannot go back inside with his gun. Miller also referred to the device as a "gun"—not a fake gun, a device, or otherwise—when he informed his friend that he was going to "go put [his] gun up and try again." After he re-entered the building, Miller told his friend that "[he] d[idn't] have [his] gun on [him]

---

argument by not raising it in his initial appellate brief. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (collecting cases).

[4] *See also Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) ("Further, although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."); *Carnaby*, 636 F.3d at 187 ("A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" (quoting *Scott*, 550 U.S. at 381)).

no more." Moreover, when Miller returned to City Hall and walked up to Officer Rivera at the security table, he told her "[he] took it off" but did not clarify that "it" was a fake gun. And although Miller mentioned to his friend that the gun was rubber when they both stood at the receptionist's desk, he spoke in a hushed tone, and it is not clear that Officer Rivera—or any other officers—heard him.

**2.**

Miller failed to provide the panel with any authority showing that an otherwise proper warrant application is objectively unreasonable if officers could have taken additional, pre-warrant steps to confirm or dispel the facts underlying the application. Indeed, an officer can generally take additional steps to confirm or deny facts underlying a warrant application, but, as the Supreme Court has recognized, time can pass between the facts described in an affidavit supporting probable cause and the issuance of a warrant. *See United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006) (citing *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir. 1993)). This bolsters the proposition that police officers do not need to exhaust all possible fact-finding to confirm or dispel their suspicions before seeking a warrant.

**3.**

This court has long recognized that an officer submitting a warrant application need not have firsthand knowledge of all the facts underlying the application. *United States v. Holmes*, 537 F.2d 227, 235–36 (5th Cir. 1976) (collecting cases showing there is "ample" support for the proposition that "personal firsthand observations of an affiant government agent are not required for the supporting affidavit" and, in fact, such affidavits may be based on hearsay, among other things). Therefore, the fact that the officer who drafted the investigative report (Vasquez) and the officer who signed the

affidavits based on that report (King) relied on secondhand information does not mean that the warrant itself lacked probable cause.

The affidavit also provides enough information to connect the evidence the police officers sought to Miller's house. The affidavit recounted four eyewitness officer accounts plus available video evidence that reasonably appeared to show that Miller entered City Hall with a firearm. It also stated that "[i]t is the belief of Affiant that [Miller's] listed house and vehicle contain[] items," including "[a] black semi-auto hand gun," "constituting evidence that the offense of Place weapons prohibited, in violation of section 46.03 of the Penal Code of the State of Texas, has been committed." This is more than what is found in the "bare bones" affidavits that this court routinely rejects. *Compare United States v. Morton*, 46 F.4th 331, 337 (5th Cir. 2022) (providing examples of bare bones affidavits, including an affidavit that "said nothing more than that the agent 'has cause to suspect and does believe that certain merchandise . . . has otherwise been brought into the United States contrary to law, and that said merchandise is now deposited and contained within' the defendant's home"), *cert. denied,* 143 S. Ct. 2467 (2023), *with id.* (describing the affidavit in *Morton* as "hav[ing] some meat on the bones" because "[e]ach is over three pages and fully details the facts surrounding Morton's arrest and the discovery of drugs and his phones").

**4.**

At the time of writing the warrant application, the officers did not have access to any *exculpatory* evidence, i.e., evidence that itself would obviate any criminal liability, and therefore, the officers could not have omitted any such evidence from the application.[5] Miller complains about the affidavit's

---

[5] Miller notes that the officers searched his car—where he alleged that he put the fake rubber gun—during the raid but did not recover the gun. Whether the officers located the gun during their search is immaterial to the determination of whether the officers

omission of the facts that Miller re-entered City Hall, passed security, and was not detained or searched. But these facts do not exculpate Miller; they do nothing to undermine *the* decisive fact in the affidavit—video evidence that Miller openly carried what appeared to be a Glock handgun into a government building that included a court. No alleged representation or omission can change the fact that the application contains a clear, independently sufficient basis to support a warrant.

**5.**

Miller argues that because the officers failed to take steps to confirm or dispel their alleged reasonable suspicion, any suspicion is vitiated the moment the suspect leaves the premises and cannot ripen into probable cause. We find this argument unavailing. Miller's position, if adopted, would mean that information of a suspected crime, once the crime is effectuated, becomes stale *the moment* the suspect leaves the premises of the crime and cannot support probable cause necessary to justify a warrant. But that view has no basis in law.

Although the Supreme Court has held that "the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past," *Grubbs*, 547 U.S. at 95 n.2 (cleaned up) (quoting *Wagner,* 989 F.2d at 75), only a few hours passed between Miller's visit to City Hall, the issuance of the warrants, and the execution of the warrants. The information underlying the warrant applications did not go stale within a few hours. *See,*

---

omitted exculpatory evidence in their application for a warrant. Setting aside the question of whether the allegedly fake gun is in fact exculpatory, the officers only potentially had access to this evidence *after* securing the warrant.

*e.g.*, *United States v. Lewis*, 332 F. App'x 951, 954 (5th Cir. 2009) (information obtained within seventy-two hours of affidavit execution was sufficiently close to reflect probable cause for a warrant); *see also* 2 Wayne R. LaFave, Search And Seizure: A Treatise On The Fourth Amendment § 3.7(a) n.15 (6th ed. 2024) (collecting cases from across jurisdictions where ranges from three to six days were temporally close enough to make the information underlying the warrant application not stale); Adam Treiger, *The Warrant Requirement*, 82 Geo. L.J. 607, 610 n.70 (1994) (collecting cases).

The information obtained during Miller's first City Hall visit was sufficient to establish probable cause—not just reasonable suspicion—because multiple police officers saw, and video evidence corroborates, a clearly visible object that appeared to be a gun in a government court.

**6.**

Miller argues that certain indicia, which seemingly reflect animus against Miller, taint the ensuing search and prosecution. But any impure motivation that the officers allegedly had is immaterial for purposes of the qualified-immunity analysis: What matters is not subjective intent but rather the "objective legal reasonableness" of the action. *Harlow,* 457 U.S. at 819. Further, "'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search'" unless (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) "the issuing magistrate wholly abandoned his judicial role," (3) "an affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" or (4) "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things

to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 922–23 (citations omitted). For the reasons stated above, the first, third, and fourth exceptions are not applicable here, and Miller did not argue that the second exception applies.

## III.

Next, Plaintiffs argue that Defendants are not entitled to qualified immunity on Plaintiffs' First Amendment claims because the officers retaliated against Miller for being "a [c]itizen journalist and [a]ctivist, and [b]ecause of [h]is [a]ctivity in [f]iling a [c]omplaint with the City of Leon Valley." We disagree.

## A.

It is clearly established, settled law "that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman*, 547 U.S. at 256).

In general, a plaintiff pursuing a claim of retaliatory arrest or prosecution "must plead and prove the absence of probable cause for the arrest." *Id.* at 402, 400–01. If the plaintiff can demonstrate the absence of probable cause, "then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation." *Id.* at

404 (alterations in original) (internal quotations omitted) (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018)).

Alternatively, even if the plaintiff cannot demonstrate the absence of probable cause to arrest, the *Nieves* exception may apply and allow a retaliatory-arrest or -prosecution claim to proceed. "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. The exception can apply under certain circumstances, such as "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," *id.* at 407, but evidence of "virtually identical and identifiable comparators" is not required. *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam). The Supreme Court clarified in *Gonzalez* that "[t]he only express limit we placed on the sort of evidence a plaintiff may present for th[e] purpose [of the *Nieves* exception] is that it must be objective in order to avoid 'the significant problems that would arise from reviewing police conduct under a purely subjective standard.'" *Id.* (quoting *Nieves*, 587 U.S. at 407). The *Nieves* exception "account[s] for 'circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Id.* (quoting *Nieves*, 587 U.S. at 406).

## B.

For the reasons explained above, the officers established probable cause for the underlying criminal charge based on their objectively reasonable belief that the gun was real. Plaintiffs' First Amendment claims therefore only survive summary judgment if they can show that the *Nieves* exception,

as interpreted in light of *Gonzalez*, applies.[6] Plaintiffs cannot make that showing.

Plaintiffs offered the following evidence to show that the *Nieves* exception applies: (1) deposition testimony from Officer Rivera that she "want[ed] to say that" she had never arrested or detained anyone for violating Texas Penal Code Section 46.03; (2) "the officers' decision to seek an arrest warrant and conduct a midnight raid rather than detain, cite, or arrest Miller on the scene was highly irregular for a non-violent misdemeanor offense," as Officer Wells testified that he would not have arrested Miller; (3) "[t]he timing of Miller's arrest—shortly after he filed a complaint against the city—and the surrounding events, including Chief Salvaggio's statements about sending Miller a message, participating in the midnight raid, and laughing at the handcuffed Miller in his living room"; (4) the warrant affidavit's "focus[] on Miller's status as an 'auditor' rather than the elements of the alleged offense or how any evidence would be found in his home"; and (5) Chief Salvaggio's post-arrest statements indicating differential treatment. This evidence is insufficient to demonstrate that the First Amendment claims fall within the *Nieves* exception in light of *Gonzalez*.

In *Gonzalez*, the Supreme Court concluded that the evidence provided by the plaintiff in that case—a survey of "the past decade's misdemeanor and felony data for Bexar County" showing "that the Texas anti-tampering statute had never been used in the county 'to criminally charge someone for

---

[6] Recently, the Supreme Court vacated this court's judgment in *Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024) (en banc), *cert. granted, judgment vacated sub nom. Villarreal v. Alaniz, et al.*, No. 23-1155, 2024 WL 4486343 (U.S. Oct. 15, 2024) and advised the court to reconsider the case "in light of *Gonzalez*." *Villarreal*, 2024 WL 4486343, at *1. In *Villarreal*, this court applied the narrow version of the *Nieves* test, not the post-*Gonzalez* version. 94 F.4th at 398. We do not take that approach here.

trying to steal a nonbinding or expressive document'"—was sufficient to qualify for the *Nieves* exception. *Id.* at 657–58.

Plaintiffs argue that "no other person was ever arrested for this crime," but the evidence does not support that assertion.[7] The evidence Plaintiffs provide is that *one* police officer had not made any arrests in connection with violations of Texas Penal Code Section 46.03 and that another officer would not have arrested Miller. However, that evidence is not the same as the survey data in *Gonzalez*, which catalogued a *decade* of misdemeanor and felony data. Just because Officer Rivera had never made any arrests for violations of Texas Penal Code Section 46.03 and Officer Wells would not have arrested Miller does not mean that officers at Leon Valley City Hall did not *typically* exercise their discretion to make those arrests or that *no other person* was ever arrested for violating Texas Penal Code Section 46.03.

Evidence that Miller's arrest occurred shortly after he filed a complaint also does not indicate that officers have probable cause to make arrests for violations of Texas Penal Code Section 46.03, but typically do not exercise their discretion to do so. Rather, that kind of timing evidence is relevant to the *Mt. Healthy* analysis that occurs only if Plaintiffs can prove the absence of probable cause to arrest. *Nieves*, 587 U.S. at 404 (under the *Mt. Healthy* test "[t]he plaintiff must show that the retaliation was a substantial

---

[7] Plaintiffs' citation to *Murphy v. Schmitt*, No. 22-1726, 2023 WL 5748752 (8th Cir. Sept. 6, 2023), *cert. granted, judgment vacated,* No. 23-1228, 2024 WL 4426466 (U.S. Oct. 7, 2024), does not aid their argument. In *Murphy*, the plaintiff asserted at the motion-to-dismiss stage that a reasonable investigation would show that police officers did not arrest people, other than the plaintiff, for the crime he had committed. *Id.* at *2. Not only is *Murphy* not binding on this court, but the procedural posture in this case is also different—summary judgment versus motion to dismiss—and Plaintiffs do not make the same argument as the plaintiffs did in *Murphy*.

or motivating factor behind the [arrest]" (alterations in original) (internal quotations omitted) (quoting *Lozman*, 585 U.S. at 97)); *see also Gonzalez*, 602 U.S. at 667 (Alito, J., concurring) (timing "evidence can be considered only after [the plaintiff's] claim advances to the *Mt. Healthy* framework. Any other approach would render the *Mt. Healthy* framework redundant in most, if not all, cases"). Because Plaintiffs did not prove the absence of probable cause, their First Amendment claims cannot advance to the *Mt. Healthy* framework, and timing evidence is irrelevant.

Chief Salvaggio's statements and laughter during the midnight raid, his post-arrest statements, and statements made by other officers in the warrant affidavit also do not support the application of the post-*Gonzalez Nieves* exception because they are subjective. The Supreme Court specifically noted that "[b]ecause [the *Nieves* exception] inquiry is objective, the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." *Nieves*, 587 U.S. at 407 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). *Gonzalez* reiterated that a plaintiff must provide *objective* evidence. 602 U.S. at 658. The objective evidence shows that Miller openly carried what appeared to be a Glock handgun into a government building that included a court.

Accordingly, we decline to overturn the district court's grant of summary judgment to Defendants as to Plaintiffs' First Amendment claims on the basis of qualified immunity.

## IV.

For the foregoing reasons, we AFFIRM the district court in all respects.